Argued and submitted September 4, 1992, decision of the Court of Appeals and judgment of the district court reversed, case remanded to the district court for further proceedings April 29, 1993

## CITY OF PORTLAND,
*Petitioner on Review,*

*v.*

## LUGENE ALVA JACKSON,
*Respondent on Review.*

(DC DA 396491-8906; CA A64089; SC S39063)

850 P2d 1093

Madelyn F. Wessel, Deputy City Attorney, Portland, argued the cause and filed the petition for petitioner on review.

Garrett A. Richardson, Multnomah Defenders, Inc., Portland, argued the cause for respondent on review.

PETERSON, J.

Unis, J., filed a specially concurring opinion.

Fadeley, J., filed a dissenting opinion in which Carson, C. J., joined.

## PETERSON, J.

The issue in this case is this: When a state statute that forbids public exposure of genitalia has as an element "the *intent* of arousing the sexual desire of the person or another person," and a defendant is prosecuted under a city ordinance that forbids public exposure of genitalia, regardless of the defendant's culpable mental state, is the city ordinance in conflict with the statute and therefore invalid under the "home rule" provision of the Oregon Constitution, Article XI, section 2? We hold that the city ordinance is not invalid.

Defendant was charged with a crime, "indecent exposure," under a Portland City Code ordinance, PCC § 14.24.060, which provides:

> "It is unlawful for any person to expose his or her genitalia while in a public place or place visible from a public place, if the public place is open or available to persons of the opposite sex."

Defendant demurred, claiming that the ordinance is invalid because it is in conflict with the state "public indecency" statute, ORS 163.465, which provides in part:

> "(1)   A person commits the crime of public indecency if while in, or in view of, a public place the person performs:
>
> "* * * * *
>
> "(c)   An act of exposing the genitals of the person with the intent of arousing the sexual desire of the person or another person."

The trial court sustained the demurrer and dismissed the case. On the city's appeal, the Court of Appeals affirmed, stating that the city ordinance "prohibits what the state legislature intended to permit." *City of Portland v. Jackson,* 111 Or App 233, 245, 826 P2d 37 (1992).

In 1906, Article XI, section 2, and Article IV, section 1a (now section 1(5)), of the Oregon Constitution were added in order to provide "home rule" for cities and towns. For our purposes, we are concerned with Article XI, section 2, which in part provides:

> "The Legislative Assembly shall not enact, amend or repeal any charter or act of incorporation for any municipality, city or town. The legal voters of every city and town are hereby

granted power to enact and amend their municipal charter, *subject to the Constitution and criminal laws of the State of Oregon * * *.*" (Emphasis added.)

Article XI, section 2, has long been interpreted to prohibit local governments from enacting legislation that conflicts with state criminal laws.

■ *Rose v. Port of Portland*, 82 Or 541, 162 P 498 (1917), contains an extensive discussion of the events leading to the adoption of Article XI, section 2, of the Oregon Constitution. "[T]he idea which was uppermost in the minds of all was to take from the legislature the power to make *a* charter for *a* city or town by a *special* law." 82 Or at 561 (emphasis in original). The opinion makes it clear that local governments "could legislate concurrently upon the same subject and make use of its legislation if the city legislation did not conflict with the state legislation." *Id.* at 571. *See also Harlow v. Clow*, 110 Or 257, 263, 223 P 541 (1924) (city vagrancy ordinance that provided for a lesser penalty than a duplicate state statute held not in conflict), *partially overruled on other grounds by Landreth v. Gladden*, 213 Or 205, 324 P2d 475 (1958). We interpret the words "subject to" in Article XI, section 2, to mean "not in conflict with." Local governments cannot enact criminal laws in conflict with state criminal laws. Local governments thus are barred from, *e.g.*, creating a "safe haven" for outlaws by legalizing, within the boundaries of the city, that which the legislature has made criminal statewide. This case, defendant claims, involves the converse of the foregoing scenario; here, a city ordinance is alleged to be "in conflict with" a state statute because the ordinance forbids conduct that, according to defendant, state law permits. We turn to that question.

■ The "not in conflict" interpretation of Article XI, section 2, was used by this court recently in *City of Portland v. Dollarhide*, 300 Or 490, 714 P2d 220 (1986). There, a city prostitution ordinance was virtually identical to a state statute, except that the ordinance required a mandatory minimum sentence, while the statute did not. This court held that the sentencing provision of the ordinance violated Article XI, section 2. The *Dollarhide* court stated a method for determining whether a criminal ordinance and statute are in conflict:

"[I]n determining whether the * * * provisions of a city criminal ordinance conflict with a state criminal statute, the

test is whether the ordinance prohibits an act which the statute permits, or permits an act which the statute prohibits." 300 Or at 502.

Under the *Dollarhide* test, if a statute *permits* conduct that an ordinance *prohibits*, the two laws are in conflict.

Statutes defining crimes normally are not written in terms of permitted conduct; they normally are written to prohibit conduct. If the criminal statutes of Oregon are interpreted to permit all conduct not prohibited, the interpretation would swallow Article XI, section 2, for it would bar all local governments from legislation in the area of criminal law unless the local legislation was identical to its state counterpart. The question, then, is one not asked or answered in *Dollarhide*: How does one determine whether a state law *permits* that which an ordinance prohibits? This question may be answered in several ways.

1.   The legislature expressly could occupy an entire field of legislation on a subject, and expressly preclude local legislation on the subject. Or, stated otherwise, the legislature could pre-empt the field. For example, ORS 430.325(1) prohibits local governments from creating offenses that involve public intoxication, public drinking, and drunk and disorderly conduct.[1] In essence, the legislature has made a decision to prevent local governments from regulating those subjects. *Compare Harlow v. Clow, supra*, 110 Or at 263 ("It was not the intention of the legislative assembly, by the enactment of the statute against vagrancy, to occupy the whole field of legislation upon that subject.").[2]

---

[1] ORS 430.325(1) provides in part:

"A political subdivision in this state shall not adopt or enforce any local law or regulation that makes any of the following an offense, a violation or the subject of criminal or civil penalties or sanctions of any kind:

"(a) Public intoxication.

"(b) Public drinking, except as to places where any consumption of alcoholic beverages is generally prohibited.

"(c) Drunk and disorderly conduct."

[2] The legislature also expressly could permit local legislation on a subject. The legislature has done this. For example, ORS 430.325(2) expressly authorizes local governments to regulate "driving while under the influence of intoxicants."

2.  The legislature could *expressly* permit specified *conduct. See, e.g.*, ORS 166.370(2)(d) (persons with a permit to carry a concealed handgun cannot be prosecuted for possessing a firearm in a public building). By implication, local governments could not criminalize the specified conduct.

3.  The legislature could otherwise manifest its intent to permit specified *conduct*. By implication, local governments could not prohibit the specified conduct.

*City of Portland v. Lodi*, 308 Or 468, 474, 782 P2d 415 (1989), is illustrative of legislative permission by implication. In *Lodi*, a city ordinance prohibited the carrying of a pocketknife with a blade beyond a certain length. The legislature had enacted a statute concerning concealed weapons. The legislative history revealed that an earlier draft of the proposed law had listed as a dangerous weapon "any knife other than a pocketknife," along with a switchblade, dirk, or dagger. A legislative subcommittee later amended the bill by removing all reference to knives other than switchblades, dirks, or daggers. The *Lodi* court held that, because the legislative history showed that a decision had been made to permit the concealed carrying of any knife not a switchblade, dirk, or dagger, the city ordinance *prohibited* conduct that the legislature intended to *permit*, and the ordinance was displaced by the state statute. 308 Or at 475. "The search is not for particular words but for a political decision, for what the state's lawmakers either did or considered and chose not to do." *Id.* at 474.

Neither *Dollarhide* nor *Lodi* addressed the situation in which the statute and its legislative history are silent or unclear as to whether a decision to "permit" conduct has been made. *Dollarhide*, 300 Or at 501, states that "[t]he analysis of compatibility begins then with the assumption that state *criminal* law displaces conflicting local ordinances which prohibit and punish the same conduct."[3] (Emphasis in original.) *Dollarhide* quoted a footnote from *LaGrande/*

---

[3] It might have been more accurate to say in *Dollarhide,* consistent with other statements therein (see quotation from *Dollarhide, ante* at 146-47, that the "analysis of compatibility begins then with the *proposition* that state criminal law displaces local ordinances that conflict with a criminal statute."

*Astoria v. PERB*, 281 Or 137, 149, 576 P2d 1204, *adhered to on rehearing*, 284 Or 173, 586 P2d 765 (1978), a case concerned with whether state statutes regarding retirement benefits for city police and firefighters impinged on a local government's home rule powers. The court there stated that it is "reasonable to assume that the legislature does not mean to displace local civil or administrative regulation of local conditions by a statewide law unless that intention is apparent." In a footnote, the court then stated the *dictum* that "[t]he reservation in article XI, section 2, *supra*, regarding state criminal law reverses this assumption with respect to such laws." That passage could be interpreted in the present case to mean that, if the legislature has not made a clear decision to permit *conduct* that an ordinance prohibits, we should nevertheless "assume" that the legislature intended to permit that conduct, and thus also "assume" that the ordinance is displaced by the statute.

We disavow such an interpretation. It is important to note that *LaGrande/Astoria* concerned the constitutionality of state administrative statutes and that *Dollarhide* concerned the constitutionality of a mandatory minimum penalty provision. Neither case involved criminal laws governing *conduct*; neither involved the issue whether the state legislature, by enacting a similar statute, intended to permit *conduct* that a criminal ordinance prohibits.

The people of Oregon, by amending Article XI, section 2, gave to the people of a municipality (acting through their local government) the right to pass laws, and restrict their own individual freedom and the freedom of others within their jurisdiction, subject only to the "Constitution and the criminal laws of the State of Oregon." We cannot simply "assume" that, *by its silence*, the legislature intended to *permit* conduct made punishable under an ordinance. The state constitutional rights granted to the citizens of a municipality are not so easily discarded. When a local criminal ordinance prohibits conduct, unless the legislature has permitted that same conduct, either expressly or under circumstances in which the legislative intent to permit that conduct is otherwise apparent, the ordinance is not in conflict with state criminal law and is valid under Article XI, section 2, of the Oregon Constitution.

Events occurring near the time of the 1906 enactment of Article XI, section 2, confirm this conclusion. In 1903, the Legislative Assembly passed a special act that granted a charter to the City of Portland. Special Laws of Oregon 1903, chapter I. Article I, section 3, provided:

"The City of Portland shall be invested within its limits with authority to perform all public services and with all governmental powers, except such as are expressly conferred by law upon other public corporations and subject to the limitations prescribed by the constitution and laws of the state, except as hereinafter provided."

Article IV, section 73, of the charter, provided in part:

"The council has power and authority, subject to the provisions, limitations, and restrictions in this charter contained —

"1.   To exercise within the limits of the City of Portland all the powers, commonly known as the police power, to the same extent as the State of Oregon has or could exercise said power within said limits[.]"

Similar provisions remain in the charter to this day. The current charter contains this provision:

"The City of Portland by its Council has power and authority, subject to the provisions, limitations and restrictions contained in this Charter or in statute, to exercise any power or authority granted to the City by statute, general or special, or by this Charter, and may do any other act necessary or appropriate to carry out such authority, or exercise any other power implied by the specific power granted.

"(a)   Among such specific powers, the City has the power and authority:

"1.   To exercise within the City and City-owned property, all the powers commonly known as the police power to the same extent as the State of Oregon has or could exercise said power within said areas, and to make and enforce within said areas all necessary or appropriate water, local, police, sanitary and safety laws and regulations." City of Portland Charter, Art I, ch 2, § 2-105 (1988).

And *see, e.g., Covey Garage v. Portland*, 157 Or 117, 139, 141, 70 P2d 566 (1937) (Portland city ordinance requiring inspection of rental cars upheld under provision of Portland charter

granting the city the power "to exercise within the limits of the City of Portland all the powers commonly known as the 'police power' to the same extent as the State of Oregon has or could exercise said power within said limits"; city ordinance held not to conflict with either constitutional provision or statute).

The 1903 and 1905 legislative action occurred near the time that the Home Rule Amendment was adopted. The legislature's grant of plenary power to the City of Portland in 1903 and 1905 establishes its contemporary understanding of the powers of cities, even absent the Home Rule Amendment.[4] The drafters of the Home Rule Amendment likely were aware of these powers of local government. Assuredly, they intended to *protect* the right of cities and towns to pass legislation. They certainly did not intend to *reduce* a city's powers from those then existing.

Since *Harlow v. Clow, supra,* was decided in 1924, this court consistently has held that the validity of local criminal legislation turns on whether it conflicts with state legislation. Contrary to the assertion in the dissent, that was the basis for this court's decision in *City of Portland v. Dollarhide, supra,* and *City of Portland v. Lodi, supra.*

We turn, then, to the ordinance and statutes at issue here. As stated above, we first must examine the ordinance and statutes that the parties claim are in conflict. Next, we determine what conduct the ordinance prohibits. Third, we look to see whether the applicable statute or statutes *permit* that conduct, either by an express legislative decision, by a decision apparent in the legislative history, or otherwise. If the ordinance prohibits conduct that the statute permits, the laws are in conflict and the ordinance is displaced under Article XI, section 2.

We again quote the ordinance and statute at issue. Defendant was charged with "indecent exposure" under PCC

---

[4] The legislature continues to recognize the powers of local governments. ORS 221.916 lists the powers of city councils, including the power to:

"(8) Suppress and prohibit anything which is injurious to the public morals, public safety or the public health of the inhabitants of any such city, including the power to define, suppress and prohibit nuisances of every kind, including those arising out of the receipt, sale or disposal of intoxicating liquor in violation of law."

§ 14.24.060, which provides:

"It is unlawful for any person to expose his or her genitalia while in a public place or place visible from a public place, if the public place is open or available to persons of the opposite sex."

Defendant claims that the ordinance is in conflict with the state "public indecency" statute, ORS 163.465, which provides in part:

"(1)   A person commits the crime of public indecency if while in, or in view of, a public place the person performs:

"* * * * *

"(c)   An act of exposing the genitals of the person with the intent of arousing the sexual desire of the person or another person."

The ordinance prohibits all public exposure of genitalia if the public place is "open or available to persons of the opposite sex," regardless of the person's mental state; the statute prohibits only public exposure of genitalia accompanied by the intent of arousing a person's sexual desire.

Our next inquiry is whether the Oregon legislature intended to "permit" conduct that the ordinance proscribes — non-sexually motivated public exposure of genitalia in a public place open to or available to persons of the opposite sex. It has not, by legislation, expressly permitted public exposure of genitalia occurring without an intent to arouse. We examine the legislative history to see whether it has otherwise manifested its intent to allow such conduct.

■■   In 1971, the legislature enacted ORS 163.465 and repealed *former* ORS 167.145, an "indecent exposure" statute, which had remained essentially unchanged since 1864.[5] Arguably, *former* ORS 167.145 prohibited sexually motivated behavior *and* non-sexually motivated behavior. Thus, its

------

[5] *Former* ORS 167.145, *repealed by* Or Laws 1971, ch 743, § 432, provided:

"Any person who wilfully and lewdly exposes his person or the private parts thereof in any public place, or in any place where there are present other persons to be offended or annoyed thereby, or takes any part in any model artist exhibition, or makes any other exhibition of himself to public view, or to the view of any number of persons, which is offensive to decency, or is adapted to excite vicious or lewd thoughts or acts, shall be punished upon conviction by imprisonment in the county jail for not less than three months nor more than one year, or by a fine of not less than $50 nor more than $500."

repeal and replacement with a law that prohibits only sexually motivated public nudity is evidence that the legislature made a decision to permit non-sexually motivated public nudity. Repeal of a statute may be evidence of a political decision to permit conduct that was previously forbidden.

In the present case, however, *former* ORS 167.145 was *replaced*, and the commentary to its replacement, ORS 163.465, does not indicate that the legislature intended to permit non-sexually motivated public nudity. The commentary states that "[a]n exposure that is not sexually motivated would not violate this section, but might be 'disorderly conduct.'" Criminal Law Revision Comm, Oregon Criminal Code of 1971, SB 40, *reprinted in* Proposed Oregon Criminal Code, Final Draft and Report § 120, *Public Indecency* at 129 (July 1970). Whether or not public nudity would constitute "disorderly conduct,"[6] this commentary is insufficient to demonstrate a legislative political decision to permit non-sexually motivated public nudity.

Defendant contends that a correct interpretation of the commentary to the Criminal Code indicates that the legislature considered criminalizing non-sexually motivated public nudity, but chose not to. Defendant relies on the Commentary to Tentative Draft No. 1 of the Proposed Oregon Criminal Code, which states that the public indecency statute, ORS 163.465, "requires an intent to arouse the sexual desire of the actor or another. An accidental or negligent exposure would not violate this section." Judge Richard L. Unis, Oregon Criminal Code 1972, Preliminary and Tenatative Drafts, Art 13, Sexual Offenses, Tentative Draft No.

---

[6] ORS 166.025 provides in part:

"(1) A person commits the crime of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, the person:

"* * * * *

"(g) Created a hazardous or physically offensive condition by any act which the person is not licensed or privileged to do.

"(2) Disorderly conduct is a Class B misdemeanor."

The language of ORS 166.025 gives no indication that the legislature intended to prohibit all non-sexually motivated public nudity as "disorderly conduct." ORS 166.025, the disorderly conduct statute, requires a mental state of recklessness or intent. An accidental or negligent exposure would not be criminalized as disorderly conduct; PCC § 14.24.060 would criminalize such an exposure.

1, at p 70 (Feb. 1970). Defendant asserts that this passage establishes that the legislature made a political decision to "permit" accidental or negligent public exposure of genitalia.

We do not agree with defendant. The statement in the tentative draft was not included in the commentary. The lone statement in Draft No. 1 is far from establishing a legislative political decision.

■     We do not believe that the repeal of *former* ORS 167.145, without more, establishes a legislative political decision to permit non-sexually motivated public nudity. In the absence of stronger evidence of legislative intent, we are unconvinced that the legislature intended to permit the conduct prohibited in the city ordinance. Therefore, city's "indecent exposure" ordinance does not conflict with the state "public indecency" statute, and the ordinance is valid under Article XI, section 2, of the Oregon Constitution.

The decision of the Court of Appeals and the judgment of the district court are reversed. The case is remanded to the district court for further proceedings.

**UNIS, J.,** specially concurring.

I agree that Portland City Code (PCC) § 14.24.060 does not conflict with ORS 163.465, the state "public indecency" statute, and is valid under the "home rule" provision of the Oregon Constitution, Article XI, section 2. Because I do not agree totally with the statements and reasoning of the majority's opinion, I write separately.

Article XI, section 2, of the Oregon Constitution empowers "the legal voters of every city * * * to enact and amend their municipal charter, subject to the Constitution and criminal laws of the State of Oregon." The City of Portland (City), like many other Oregon cities, possesses extensive police power authority delegated to it by the State of Oregon.[1] This extensive police power authority was initially obtained by the City in 1903 when, by special legislative act, the legislature enacted a new charter for the City. Preamble to Special Laws of Oregon 1903 (City's 1903 charter).

---

[1] For example, as to cities organized under the 1893 Incorporation Act (now ORS 221.901 *et seq*), *see* ORS 221.916 and, in particular, subsections 8 and 10 thereof.

Chapter III, Article IV, section 73(1), of the City's 1903 charter granted the Portland City Council the power *"[t]o exercise within the limits of the City of Portland all the powers commonly known as the police power, to the same extent as the State of Oregon has or could exercise said power within said limits."*[2] (Emphasis added). Section 73(2) of that same chapter further granted the City the power *"[t]o make and enforce within the limits of the city all necessary* water, local, *police,* and sanitary *laws and regulations."* (Emphasis added).

The legislature amended the City's 1903 charter in 1905. Special Laws of Oregon 1905, ch 248, §§ 1-4, pp 191-96; ch 249, §§ 1-8, pp 197-202. Those amendments did not, however, affect the police power granted to the City in 1903. The legal voters of the City have periodically amended the 1903 charter under the home-rule powers of the Oregon Constitution (Or Const, Art XI, § 2; Or Const, Art IV, § 1(5)),[3] but have reenacted and thus preserved intact the same broad police power authority originally enacted for it by the legislature in the 1903 City charter. That broad police power, recognized by this court in *Covey Garage v. Portland,* 157 Or 117, 122, 70 P2d 566 (1937), is presently found in Portland Charter section 2-105(a)(1). That section gives the City the power:

---

[2] The City's first legislative charter became effective January 23, 1851, upon the passage by the Council of the Legislative Assembly of the Territory of Oregon. Special Laws of Oregon 1850-51, §§ 1-28, pp 16-22.

[3] Or Const, Art XI, § 2 (originally in the Constitution of 1859 and amended by initiative petition in 1906 and 1910); Or Const, Art IV, § 1(5) (adopted in 1968 in lieu of former sections 1 and 1a, which had origins in the Constitution of 1859 and were adopted in 1902 and 1906 respectively). "By constitutional amendments the people of Oregon in 1906 empowered 'the legal voters of every city and town . . . to enact and amend their municipal charter, subject to the constitution and criminal laws of the state,' [Or Const, Art XI, § 2,] and reserved the powers of initiative and referendum 'to the legal voters of every municipality . . . as to all local, special and municipal legislation, of every character, in and for their respective municipalities.' [Or Const, Art IV, § 1-a.]" Etter, *General Grants of Municipal Power in Oregon,* 26 Or L Rev 141, 157 (1947) (footnote information inserted in brackets). The current version of Article IV, section 1(5), of the Oregon Constitution empowers "the qualified voters of each municipality" to exercise the powers of initiative and referendum "as to all local, special and municipal legislation of every character in and for their municipality * * *." Article XI, section 2, and Article IV, section 1(5), of the Oregon Constitution are closely related and are to be construed together. *See Schmidt et al v. City of Cornelius,* 211 Or 505, 512, 316 P2d 511 (1957), and cases there cited. *See also* Ronchetto and Woodmansee, *Home Rule in Oregon,* 18 Or L Rev 216, 217 n 4, 218 (1939).

*"To exercise within the City* and City-owned property, *all the powers commonly known as the police power to the same extent as the State of Oregon has or could exercise said power within said areas, and to make and enforce within said areas all necessary or appropriate* water, local, *police,* sanitary and safety *laws and regulations."* (Emphasis added.)[4]

Moreover, Portland Charter section 2-106 provides:

"[E]numeration of the particular powers granted to the Council in this Charter shall not be construed to impair any grant of power herein contained, express or implied, nor to limit any such general grant to powers of the same class or classes as those so enumerated. *The City Council may exercise any power or authority granted by the Oregon statute to municipal corporations at any time* and also to cities of a class which includes the City of Portland." (Emphasis added.)

The ordinance at issue in this case, PCC § 14.24.060, was enacted pursuant to the City's broad police power; it concerns a subject matter which is within the scope of the City's police power. Under Article XI, section 2, of the Oregon Constitution, the state's authority in the field of criminal law is paramount to that of a city.[5] The fact that, under Article XI, section 2, the state's authority in the field of criminal law is paramount to that of a city necessarily means that a city (1) cannot enact a penal law on a particular subject if the state legislature has preempted[6] either the field of criminal law or that subject, and (2) cannot enact a penal law that conflicts with the Oregon Constitution or state criminal laws.

---

[4] Portland Charter section 2-105 contains 65 specifically-enumerated powers granted to the City, many of which are specific police powers.

[5] The phrase "subject to," in the context of Article XI, section 2, of the Oregon Constitution

"implies * * * that city voters cannot include in a city charter any feature that runs counter to the constitution or criminal laws of the state. The phrase also implies that subsequent changes in the constitution and criminal laws apply to charters and ordinances, impliedly amending or even repealing every conflicting provision in them. The phrase implies that the preceding prohibition against the legislature's amending a city charter is limited to amendment by noncriminal law, allowing the legislature to affect city law by state criminal law but not by noncriminal general law — * * * not by 'civil' law." Etter, *Municipal Home Rule in Oregon* 554-55 (Sourcebook version 1991) (footnotes omitted).

[6] The effect of preemption is to place the subject matter beyond the legislative competence of municipalities. *See* Note, *Conflicts Between State Statutes and Municipal Ordinances,* 72 Harv L Rev 737, 746 (1959).

Extensive state legislation in a particular field does not necessarily mean that the state has preempted the field. Rather, when the state has intended its legislation to be exclusive, the state has preempted the field, thereby placing the subject matter beyond a city's legislative competence to act in that field.[7] With respect to criminal laws, that intent must be explicit, because in the absence of an explicit intent to preempt a field, ORS 221.330 expressly authorizes cities to "adopt as ordinances any statutes of the State of Oregon, *the subject matter of which is within the scope of the charter authority* by reference to the chapter or section, without further publication or posting thereof." (Emphasis added.) *See generally* Etter, *Referential Practices in Municipal Legislation*, 39 Or L Rev 209 (1960); O'Connell, *Municipal Corporations - Ordinances - Constitutionality of City Ordinances Which Adopt State Statutes By Reference*, 37 Or L Rev 272 (1958). This court has recognized that the mere fact that certain conduct constitutes a crime under Oregon's criminal statutes does not preclude any Oregon municipality from having concurrent authority to proscribe and punish the identical conduct. *See, e.g., City of Portland v. Dollarhide*, 300 Or 490, 714 P2d 220 (1986) (city prostitution ordinances upheld after court severed invalid penalty provision); *Harlow v. Clow*, 110 Or 257, 223 P 541 (1924) (city vagrancy ordinance upheld) (partially overruled on other grounds by *Landreth v. Gladden*, 213 Or 205, 324 P2d 475 (1958)); *Portland v. Parker*, 69 Or 271, 138 P 852 (1914) (city vagrancy ordinance upheld); *Wong v. City of Astoria*, 13 Or 538, 11 P 295 (1886) (city ordinance prohibiting operating a bawdy house upheld).

In this case, there is no explicit legislative intent to preempt the field of criminal aspects of public indecency. To the contrary, the extensive police power delegated to the City by the 1903 special legislative charter, described above, demonstrates that the legislature did *not* intend to preempt either the field of criminal law or the subject of criminal aspects of public indecency.

Additional evidence of an absence of state preemption in the field of criminal aspects of public indecency is

---

[7] The legislature may, of course, reserve for its exclusive control certain aspects of a particular subject matter and leave other aspects of that subject matter for municipal legislation.

demonstrated by the provisions of ORS 221.916(8). Under that statute, cities organized under the 1893 Incorporation Act (now ORS 221.901 through ORS 221.930) have the express power to "[s]uppress and prohibit anything which is injurious to the *public morals, public safety* or the public health of the inhabitants of any such city[.]" ORS 221.916(8) (emphasis added). Thus, the state has not preempted either the entire field of criminal law or the criminal aspects of public indecency to the exclusion of municipal penal legislation. Nevertheless, even though a city's authority to act in a particular field of criminal law is not preempted, the city's penal legislation, in order to be valid, cannot conflict with state criminal laws. In *City of Portland v. Dollarhide, supra,* 300 Or at 502, this court stated a general test for determining whether a conflict exists between a state criminal law and a municipal penal ordinance. That test is "whether the [city] ordinance prohibits an act which the statute permits, or permits an act which the statute prohibits."[8]

If an ordinance *expressly forbids* what state law *expressly permits,* or vice versa, a conflict is obvious. It is error, however, to assume that the legislature's silence in an area is the equivalent of an affirmative decision not to proscribe conduct, such that a municipal ordinance proscribing the conduct is somehow in conflict with the legislature's silence. In many instances, the particular conduct is not even considered by the legislature. Even if the conduct was considered, the failure to enact state legislation may be motivated by considerations other than or in contrast with an affirmative decision not to proscribe conduct, *e.g.,* the legislators' belief that the conduct adequately can be dealt with by local legislation.

In this case, the challenged ordinance, PCC § 14.24.060, prohibits conduct that is not forbidden by state

---

[8] Rigid adherence to the general conflict test can result in an unsatisfactory result in some situations. A city ordinance may interfere with, alter, or impede defined state policies or objectives and yet satisfy the general conflict test. *Fischer v. Miller,* 228 Or 54, 363 P2d 1109 (1961), illustrates state preemption in a field to the exclusion of local legislation. In *Fischer,* this court found the state law on its face to be exclusive. This court found that the state law gave the Oregon State Game Commission *full* power and authority concerning hunting of game birds. As a result, this court declared invalid local legislation regulating the hunting of game birds. *Id.* at 58. A literal application of the general conflict test would have resulted in a different result.

law. That is, the ordinance does not prohibit what the state legislature or the Oregon voters have permitted expressly, and there is nothing contradictory between the provisions of the ordinance and ORS 163.465, the state law relating to public indecency. Each proscribes different conduct. PCC § 14.24.060, therefore, is not in conflict with state law or Article XI, section 2, of the Oregon Constitution.[9]

In sum, the City has charter or police power authority to enact prohibitory legislation dealing with public indecency within its territorial limits. Local penal legislation in the field of criminal aspects of public indecency is permissible. PCC § 14.24.060 is not in conflict with ORS 163.465, the state "public indecency" statute, or the Oregon Constitution. For these reasons, the ordinance is valid under Article XI, section 2, of the Oregon Constitution.

**FADELEY, J., dissenting.**

The court is asked to permit Portland to prohibit, as a crime in that city only, acts or conduct that would not be a crime under state law. In this specific case we are asked, without knowing the factual allegations of the charge, to bless a new crime created by the city by ordinance. The ordinance creates the new crime by generally copying a state law on the subject, except that it deletes one element required by the state law to constitute a crime.

The Portland City Code ordinance, PCC § 14.24.060, provides:

"It is unlawful for any person to expose his or her genitalia while in a public place or place visible from a public place, if the public place is open or available to persons of the opposite sex."

No intent is required. The state law, ORS 163.465, provides in part:

"(1)   A person commits the crime of public indecency if while in, or in view of, a public place the person performs:

"* * * * *

---

[9] An ordinance is also, of course, subject to constitutional attack for violation of other provisions of either the Oregon or the federal constitution. No such challenge has been raised in this case, however.

"(c) An act of exposing the genitals of the person with the intent of arousing the sexual desire of the person or another person."

As can be seen, the state law requires a specific intent before criminal sanctions are imposed but the Portland ordinance does not. Thus, in Portland, all exposures of human genitals, without a specific intent being necessary, including an exposure which would escape criminal sanctions under state law, are made criminal.

## I

This opinion evaluates the validity of the Portland city ordinance by applying a precedent of this court which the majority and concurrence[1] assiduously seek to avoid. As noted above, petitioner was charged with violating PCC § 14.24.060. Petitioner demurred, arguing that the ordinance is invalid because it conflicts with the state's criminal laws.

Indeed, petitioner is correct that serious questions about the validity of a local criminal ordinance arise when such an ordinance conflicts with a state criminal law. While Article XI, section 2, of the Oregon Constitution authorizes local governments to make their own local laws, it expressly limits that authority in the area of criminal law. That constitutional provision states:

"The legal voters of every city and town are hereby granted power to enact and amend their municipal charter, *subject to the Constitution and criminal laws of the State of Oregon.*" (Emphasis added.)

This court has determined that under Article XI, section 2, local ordinances, whether civil or criminal, are displaced by "incompatible" state law. Because that provision specifically states that local lawmaking authority is "subject to" state criminal laws and the state constitution, this court has imposed and must impose a stricter standard of compatibility in the criminal law context than would apply in the civil law context. Thus, in deciding whether a state *civil* law displaces a local *civil* ordinance, it is assumed that the

---

[1] The concurring opinion relies on delegations of police power to the city by the state legislature in the early 1900's to support the ordinance. This case is about the state constitutional provision making a city's legislative acts "subject to * * * the criminal laws of the State." Or Const, Art XI, § 2. This dissent is limited to that issue.

state and local laws are compatible unless some manifest legislative intent to exclude local legislation on the matter is found. But in deciding whether a state criminal law on a given subject displaces a local criminal ordinance, that assumption is reversed. *City of Portland v. Dollarhide*, 300 Or 490, 501, 714 P2d 220 (1986).

This court's opinion in *City of Portland v. Dollarhide* discusses and applies the proper test for assessing the compatibility of a local criminal ordinance with state law (and thus, for assessing the validity of such ordinances). In that case, a criminal defendant challenged her conviction under a Portland City Code ordinance which defined and prohibited prostitution in substantially identical terms as an Oregon state statute, but which, unlike the state statute, provided a mandatory minimum penalty. In determining that the penalty section of the ordinance was invalid due to incompatibility with the state statute, this court stated:

> "The essential test for displacement of local ordinances (civil or criminal) by state law is whether the local rule is 'incompatible with the legislative policy, either because both cannot operate concurrently or because the legislature meant its law to be exclusive.' [*LaGrande/Astoria v. PERB*, 281 Or 137, 576 P2d 1204 (1978).] In the area of civil or administrative ordinances regulating local conditions, it is reasonable to assume that the legislature did not mean to displace local ordinances, unless that intention is apparent. *See, e.g., State ex rel Haley v. City of Troutdale*, 281 Or 203, 576 P2d 1238 (1978) (finding no manifest legislative intent to exclude local provisions which 'supplemented' the state building code). *The reservation in Article XI, section 2, however, reverses this assumption with respect to state criminal law.*

> "*The analysis of compatibility begins then with the assumption that state criminal law displaces conflicting local ordinances which prohibit and punish the same conduct*, absent an apparent legislative intent to the contrary." *Id.* (emphasis added).

Giving force to that assumption, we placed the burden of coming forth with some evidence that the legislature authorized local *criminal* legislation in the area of prostitution when this court said:

> "The parties have cited nothing in the text or legislative history of the state laws regarding prostitution, nor have we

found anything, to indicate that the state intended cities to be authorized to enact inconsistent local [criminal] laws in this area." *Id.*

This court then went on to say:

"The inquiry does not end here, of course, because we have yet to decide how much symmetry between state and city criminal laws is required by Article XI, section 2, so as not to be in conflict. *Harlow v. Clow, supra,* [110 Or 257, 223 P 541 (1924), *overruled on other grounds by Landreth v. Gladden,* 213 Or 205, 324 P2d 475 (1958),] a case decided relatively close in time to the adoption of Article XI, section 2, suggests that, in order that the defining elements of a city's crime not conflict with state law, *they must virtually 'duplicate' the state law elements.* We state the rule that in determining whether the defining and prohibiting provisions of a city criminal ordinance conflict with a state criminal statute, the test is whether the ordinance prohibits an act which the statute permits, or permits an act which the statute prohibits. * * *

"As to the requisite symmetry of state and city criminal *penalty* provisions, we again turn to *Harlow v. Clow, supra,* for the proposition that, until the legislature intends otherwise and so indicates, city punishment of the same conduct made criminal by state law may be 'lighter' than that prescribed by state statute. However, a city penalty that is greater than the state prescribed penalty (minimum or maximum) for the same criminal conduct is incompatible with the state penalty and must fall. Nothing in the text or legislative history of the Oregon Criminal Code of 1971 contradicts this.

"Thus, under Article XI, section 2, while a city has some leeway between the state prescribed minimum and maximum criminal penalties, without evidence of legislative acquiescence, a city ordinance cannot increase either the minimum or maximum penalty that is authorized by state law for the same criminal conduct." *Id.* at 501-02 (footnote omitted; emphasis added).

Because, as indicated above, the Portland prostitution ordinance defined and prohibited prostitution in substantially identical terms as the statute, this court found that the latter part of the test had been met. Therefore, the part of the ordinance defining and prohibiting prostitution was valid.

But the "indecent exposure" ordinance at issue in this case does not survive the *Dollarhide* test. As in *Dollarhide*, we must assume, in the face of a state statute dealing with "indecent exposure," that the state legislature intended to displace the conflicting local ordinance, absent some manifestation of contrary legislative intent. Proponents of the local ordinance have pointed to nothing that suggests any such contrary intent.

But before concluding, based on the above-stated assumption, that the state indecent exposure law displaces the local law, it must be ascertained, as in *Dollarhide*, whether the state and local laws are in conflict. The language of *Dollarhide*, as quoted above, suggests that a conflict exists unless the statutes and ordinances virtually "duplicate" one another. More particularly, the local ordinance conflicts with the state law if it "prohibits an act which the statute permits, or permits an act which the statute prohibits."

That a conflict exists between the Portland indecent exposure ordinance and ORS 163.465 could not be more clear; while exposure of the genitals in a public place without any intent to sexually arouse either oneself or a viewer is lawful or "permissible" under the state criminal law, it is prohibited conduct under the local ordinance.

Thus, under the analysis set out in *Dollarhide, which requires us to assume* that local ordinances have been displaced by any conflicting state statute in the absence of any evidence of contrary legislative intent, PCC § 14.24.060 is invalid.

The majority circumvents this obvious result by interpreting the term "permit" in the *Dollarhide* test as meaning "legislatively authorize," that is, expressly approved by the legislature. This is a test that the great majority of everyday activities taking place within the state could not meet under the civil statutes, let alone in the criminal code. Furthermore, the context and the very structure of the sentence in which the term appears make it clear that the *Dollarhide* court used "permit" in its simplest sense. It was meant to convey only an absence of prohibition — that the conduct under examination is "not prohibited."

By skewing the interpretation of the term to mean "legislatively authorized," the majority turns what was intended as a simple comparison of the elements of a crime into an examination of legislative intent. Given that the first part of the *Dollarhide* test already focuses attention on the intent of the state legislature, it seems disingenuous to read the second part of the test as doing essentially, and only, the same thing. And the majority's proposed test becomes downright disastrous in application because it empowers any home rule city to make any act criminal unless that very act is covered by and also expressly permitted by state criminal law.[2]

Furthermore, the Portland indecent exposure ordinance is invalid even under the majority's erroneous analysis. The majority opinion adverts to the fact that in 1971, the state legislature repealed a longstanding indecent exposure statute which criminalized both sexually motivated and non-sexually motivated exposure and replaced it with the statute that is now in effect, which criminalizes only exposure of genitalia that is sexually motivated. That fact, in itself, would seem to attest to a conscious decision by the legislature to permit uncovering the full body so long as that act of exposure was not intended to arouse sexual desire in another person or the actor. But given that the legislative history also indicates that the legislature affirmatively considered the element of sexual motivation before the present bill was passed, a conclusion that the legislature consciously intended to permit non-sexually motivated nudity seems obligatory.[3] Therefore, even

---

[2] Under the majority's analysis, nothing prevents Portland and other Oregon cities from passing criminal ordinances on other subjects to enforce majority attitudes within that given community, such as imposing abortion procedural delays and Saturday bank openings.

The majority assigns to state criminal laws the function of disclosing what human conduct is *permitted* conduct. But those passing such laws traditionally believe, instead, that they are deciding only what conduct is *prohibited*. Looking for what is "permitted" in criminal laws designed and intended to "prohibit" is at best like looking for a needle in a haystack. At worst, it suggests that the people of the state have no personal freedoms of conduct, *vis-a-vis*, city or town government, unless spelled out in the state criminal code.

[3] As the majority points out, the legislative commentary to ORS 163.465 states, "[a]n exposure that is not sexually motivated *would not violate this section*, but might be 'disorderly conduct.'" Commentary to Oregon Criminal Code of 1971, 156 (1975).

The majority infers from this statement that the legislature had in fact not decided that nonsexually motivated conduct was permissible, because such conduct

assuming for the sake of argument, that local criminal ordinances prohibiting some conduct are invalidated only when the state has manifested some intent to affirmatively permit the conduct in the sense of consciously repealing or changing its former criminal statutes, the record shows affirmative decriminalization by the state legislature of the conduct that Portland wishes to prohibit in this case.

## II

In addition to avoiding the precedent established in *Dollarhide*, the majority opinion rests on the assumption that the Oregon Constitution authorizes local governments to make their own, dissimilar, criminal laws. An examination of the relevant language in the constitution, the history of its adoption, and past decisions discloses the error in that assumption.

Article XI, section 2, of the Oregon Constitution provides:

"The legal voters of every city and town are hereby granted power to enact and amend their municipal charter, *subject to the Constitution and criminal laws of the State of Oregon.*" (Emphasis added.)

Most of what is commonly known about the legislative history of Article XI, section 2, was summed up in Justice Harris' opinion in *Rose v. Port of Portland*, 82 Or 541, 162 P 498 (1917), *overruled on other grounds by State ex rel Heinig v. Milwaukie*, 231 Or 473, 373 P2d 680 (1962), written only 11 years after the amendment became law. Justice Harris described how a circular letter accompanied by a tentative draft of the proposed amendment was mailed "to more than a thousand representative citizens of Oregon to get their opinion on the wisdom of trying to submit the * * * suggested constitutional amendments." 82 Or at 560. The tentative

---

might be prohibited as "disorderly conduct." But the disorderly conduct statute criminalizes only disorderly behavior which is performed with an intent "to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof." ORS 166.025.

That fact strongly suggests that the "disorderly conduct" reservation in the legislative commentary merely reflected the legislature's acknowledgment that nudity accompanied by these latter types of specific intent was made criminal under the disorderly conduct heading — not that the legislature had stopped short of deciding that nudity without *some* specific intent was permitted.

draft was "substantially the same and almost identical in terms with Senate Joint Resolution No. 3, which was adopted by the legislative assembly in 1901 and again in 1903." *Id.*[4] However, the initiative petitions were not circulated until certain changes had been made to this tentative draft based on that consultation with representative citizens. *Id.* at 562.

One of those changes is significant here. According to the language in the tentative draft, which followed the language of the 1901 and 1903 state legislative resolutions,

> "cities or towns * * * shall be *subject to and controlled by general laws*. Any city shall be permitted to frame and enact a charter for its own government *consistent with and subject to the constitution and laws of this state* * * *." (Emphasis added.)

"Introductory Statements, Arguments and Suggested Amendments to the Constitution of Oregon and an Anti-Pass Law for Public Officials," at 5. But the phrase that appeared in the initiative petitions actually proposing the city home rule amendment which became part of the Oregon Constitution made the powers given cities and towns thereunder "subject to the Constitution and *criminal* laws of the State of Oregon."

Little is recorded about the precise reason for the change from the more general limitation of "general laws" to the specific "criminal laws" limitation. However, where the earlier version of a provision of law sought to prevent any conflict between state and local legislation, and the latter "amended" version, as enacted, gave local governments some freedom to enact conflicting general laws, but no equivalent freedom to enact conflicting criminal laws, we should heed that fact and give it force. As the leading authority on municipal law in Oregon put it, the phrase 'subject to,' in the context of Article IX, section 2, of the Oregon Constitution,

> "implies * * * that city voters cannot include in a city charter any feature that runs counter to the constitution or criminal laws of the state. The phrase also implies that subsequent changes in the constitution and criminal laws apply to charters and ordinances, impliedly amending or even repealing every conflicting provision in them. The phrase implies that

---

[4] Justice Harris was Speaker of the House in 1903.

the preceding prohibition against the legislature's amending a city charter is limited to amendment by noncriminal law, allowing the legislature to affect city law by state criminal law, but not by noncriminal general law — * * * not by 'civil' law." Etter, Municipal Home Rule In Oregon 555-56 (Sourcebook Version 1991) (footnotes and citations omitted).

Clearly, we must attribute *some* significance to the fact that criminal law is singled out for special treatment. Without a doubt, we must approach local criminal legislation using a standard requiring more scrutiny than local general legislation. As we said in *City of Portland v. Dollarhide, supra*, 300 Or at 497:

"[w]e are left * * * with the inescapable conclusion that the voters who adopted Article XI, section 2[,] envisioned a stricter limitation on the lawmaking power of cities in respect of criminal laws than with regard to civil or regulatory measures. *Thus, the same interpretation and assumptions of compatibility found in civil and regulatory areas cannot be applied in evaluating the relationship between state and municipal criminal laws*." (Emphasis added.)

In *City of Portland v. Dollarhide, supra*, we adopted the "reversed assumption" as the rule for analyzing state/municipal disputes in the *criminal* context. *Id.* at 501. Shortly thereafter, in *City of Portland v. Lodi*, 308 Or 468, 472, 782 P2d 415 (1989), we subjected a local criminal ordinance to the "reversed assumption" analysis again:

In the *criminal* law context, because of the "subject to * * * criminal laws of the State" language in the constitution, we should assume that the legislature did, in fact, intend to exclude local criminal legislation on the same subject. A proponent of preemption by a state criminal law may rest on that assumption *unless* the supporters of the local ordinance are able to point to some clear legislative expression (1) that the state law and municipal ordinances may function consistently or (2) that the legislature did *not* intend to exclude related local criminal law.[5]

---

[5] In *City of Portland v. Lodi*, 308 Or 468, 574-75, 782 P2d 415 (1989), we found that a municipal criminal ordinance had been preempted by pointing to legislative history of a competing state law that suggested an intention to preempt. Although instructive, this exercise was unnecessary under the terms of the above analysis. It was incumbent upon the proponents of the local ordinance to demonstrate a

We should conclude, from the foregoing analysis, that if Article XI, section 2, authorized incompatible local legislation in the criminal field, any assumption of state exclusivity would be rendered meaningless — proponents of local criminal laws could *always* point to the home rule provision as a clear expression that the state had authorized, and did not intend to exclude, their city's or town's enactments of criminal law.

Thus, Article XI, section 2, while granting local governments general authority to legislate, accomplished no such grant in the area of criminal and constitutional law. In granting charter authority to cities and towns "subject to the Constitution and criminal laws of the State of Oregon," Article XI, section 2, reserves those two areas of law to the state as a whole; it neither delegates nor cedes those two areas to any sovereignty by cities and towns.

Certainly there is no ground for objection to local criminal ordinances that exactly duplicate state criminal laws — such ordinances can provide additional enforcement, not to mention revenue for cities, without disturbing the state's legislative authority.[6] In addition, it is clear that some local power to draft criminal ordinances may arise, either expressly or by implication, from state statutes. For instance, ORS 221.410(1) appears to grant cities authority to pass criminal ordinances which are "necessary or convenient for the government of [their] local affairs."[7] ORS 221.340, dealing with

legislative intention to allow competing local criminal legislation, and their failure to do so settled the question.

[6] It is, of course, axiomatic that local governments have no inherent sovereign authority — any powers that local governments enjoy must derive from some delegation by a higher authority. *See City of Corvallis v. Carlile*, 10 Or 139 (1882) (strict construction of charter powers, ordinance requiring Sunday closures not within power of city to pass ordinances to secure the peace of the city); *Richards v. City of Portland*, 121 Or 340, 349, 255 P 326 (1927) (strict construction of charter grant of power to a municipality, doubtful cases should be resolved against finding a grant of power).

[7] ORS 221.410 in its entirety provides:

"Except as limited by express provision or necessary implication of general law, a city may take all action necessary or convenient for the government of its local affairs." Notably, this delegation of legislative authority is limited to actions related to *local* affairs. Because most of criminal law cannot be legitimately considered purely local in nature, this would appear to be a fairly significant

prosecution of city parking ordinances, and ORS 153.500(4), defining city traffic offenses, imply state authorization to pass criminal ordinances in those areas of the law.[8] On the other hand, the state legislature expressly has forbidden city legislation in certain criminal areas, including public intoxication and vagrancy, ORS 430.325(1), but at the same time, has stated that this prohibition "shall [not] affect any local law or regulation of any political subdivision in this state against driving while under the influence of intoxicants, as defined in ORS 813.010, or other similar offenses that involve the operation of motor vehicles." ORS 430.325(2).

We should conclude, therefore, that the Article XI, section 2, grants local governments a large degree of freedom to make general laws applicable to their locality, but no equivalent authority to make criminal or unconstitutional laws. When amending the state constitution to provide for home rule, the people of Oregon recognized the peculiar importance of criminal and constitutional law to our system of government, and sought to protect individual citizens from the whims of local lawmakers in those areas of the law by requiring relative uniformity across the state.[9] Local criminal ordinances which duplicate state criminal law, even where not supported by specific legislative authority, are to be tolerated and even encouraged, because they do not offend this principle of uniformity but at the same time have the beneficial effect of expanding the state's enforcement apparatus. But local criminal laws that are not precisely identical

restriction. The level of intent required to trigger criminal sanctions is not a local affair but applies uniformly statewide.

[8] *See also, e.g.,* ORS 167.121, authorizing cities and counties to allow certain "social games" in the face of state gambling laws.

[9] This court has, on at least one previous occasion, discussed the destructive effect that a patchwork pattern of local criminal ordinances would have on state criminal law. In *Winters v. Bisaillon,* 152 Or 578, 591, 54 P2d 1169 (1936), this court held that the state retained the right to enact traffic laws, "which right * * * can not be curtailed, infringed upon or annulled by local authorities." In so holding, this court said "[i]t would be a sad commentary on the wisdom of the electorate if we should hold that the movement of a citizen of the state or a traveler from abroad was subject to the whim of every municipality, great or small, between the Columbia River and the California line as to the rate of speed he should drive and the care he should exercise * * *. The state law is a criminal law whose every provision would be worthless but for the penalties prescribed for its violation." *Id.* at 585 (quoting *Lidfors v. Pflaum,* 115 Or 142, 157, 236 P 1059 (1925)).

to state laws on the same subject are presumptively invalid. Only if proponents can identify some specific expression authorizing such laws will they be allowed to stand.

I respond to proponents of a contrary interpretation of Article XI, section 2 — who argue that the amendment creates city-states and must be read generally to allow non-identical local criminal legislation — by directing their attention to the nearly contemporary interpretation of the "subject to" clause, discussed in note 9 above. *Proponents of the contrary interpretation do not offer any support*, scanty or otherwise, to rely on. I choose the interpretation supported soon after passage in *Winters v. Bisaillon*, 152 Or 578, 54 P2d 1169 (1936), and by Orval Etter.

Turning to Portland's indecent exposure ordinance, it immediately is clear that PCC § 14.24.060 departs significantly from the state indecent exposure law. To secure a conviction under the local ordinance, prosecutors need not prove "intent to arouse sexual desire" — an element that is essential for conviction under state law. Evidently, the Portland ordinance does not duplicate the state law, and is more than a localized extension of the state's enforcement authority. Therefore, it is necessary to apply the assumptions spelled out in *LaGrande/Astoria, Dollarhide*, and *Lodi*.

As stated in those cases, it must be assumed that, when analyzing a local criminal ordinance that purports to compete with a state criminal law, the state legislature intended to exclude any competing local legislation. In this case, the city has not drawn our attention to any legislative expression controverting that assumption. Nor have I been able to identify any such expressions.

In particular, the state legislature never has expressly or impliedly authorized municipal lawmaking in the area of public indecency. Nor does the general statutory grant at ORS 221.410(1) appear to authorize Portland's indecent exposure law, because that provision covers only local actions which are necessary and convenient to governance of *local* affairs, and public indecency is clearly a matter of statewide, rather than merely local, concern. In short, in the absence of concrete evidence to the contrary, I would find that the Portland exposure ordinance, punishing criminally

without requiring that the exposure be accompanied by the intent specified in state law, is the product of an *ultra vires* exercise of municipal power violative of the "subject to" clause in the home rule amendment and is therefore invalid.[10]

Carson, C. J., joins in this dissent.

---

[10] There is not the slightest hint that the home rule amendment was intended to confer on cities the power of state sovereignty to make general criminal laws, laws not necessary for controlling local affairs. A. Eaton, *The Oregon System* 59-60 (1912). In any event, Article IV, section 3, of the Constitution of the United States, a provision not yet interpreted by the highest court, provides that "no new State shall be formed or erected within the Jurisdiction of any other State."