AOYAGI, J., concurring.
The majority holds that the City of Corvallis's teenage-party ordinance is preempted by state law because the legislature made a "deliberate choice" to include a mental-state requirement in the statute. City of Corvallis v. Pi Kappa Phi , 293 Or. App. 319, 330-31, 428 P.3d 905 (2018). In my view, in both this case and others, we are applying too low a bar for implicit preemption under City of Portland v. Jackson , 316 Or. 143, 850 P.2d 1093 (1993). At the same time, I am compelled to agree with the majority's conclusion that, under our existing case law, the ordinance is unconstitutional. Accordingly, I concur, but I write separately in the hopes of spurring further discussion of the difficult issues inherent in implicit preemption.
*332 As discussed in the majority opinion, the "essential test" for preemption of local ordinances by state law is "whether the local rule is incompatible with the [state] legislative policy, either because both cannot operate concurrently or because the legislature meant its law to be exclusive." City of Portland v. Dollarhide , 300 Or. 490, 501, 714 P.2d 220 (1986) (internal quotation marks omitted). With respect to criminal laws, there is an assumption that state criminal law "displaces conflicting local ordinances which prohibit and punish the same conduct, absent an apparent legislative intent to the contrary."
*913 Id . (emphasis added). Historically, the classic conflict scenario is a local ordinance that allows conduct prohibited by state law. Jackson , 316 Or. at 146, 850 P.2d 1093. However, it is also the case that, "if a statute permits conduct that an ordinance prohibits , the two laws are in conflict." Id . at 147, 850 P.2d 1093 (emphasis in original).
Jackson recognizes that that begs a question: "How does one determine whether a state law permits that which an ordinance prohibits?" Id. at 146, 850 P.2d 1093 (emphasis in original). Because criminal statutes are normally written in terms of prohibited conduct, not permitted conduct, interpreting Oregon's criminal statutes to "permit" all conduct not expressly prohibited "would swallow Article XI, section 2, for it would bar all local governments from legislation in the area of criminal law unless the local legislation was identical to its state counterpart." Id . at 147, 850 P.2d 1093.
Jackson identifies three ways that a state law may "permit" conduct and thereby conflict with a local ordinance prohibiting it. First , the legislature may expressly "occupy an entire field of legislation on a subject." Id . An example of preempting the field is a statute that expressly "prohibits local governments from creating offenses that involve public intoxication, public drinking, and drunk and disorderly conduct." Id .Second , the legislature may "expressly permit specified conduct," such as a statute that prohibits prosecution of persons with a concealed handgun permit from possessing a firearm in a public building. Id . at 148, 850 P.2d 1093. Third , the legislature may "otherwise manifest its intent to permit specified conduct." Id . An example of this enigmatic catch-all, which I will refer to as "implicit preemption," is the concealed weapon statute at issue in *333 City of Portland v. Lodi , 308 Or. 468, 782 P.2d 415 (1989). See Jackson , 316 Or. at 148, 850 P.2d 1093. The legislative history of that statute showed that "a decision had been made to permit the concealed carrying of any knife not a switchblade, dirk, or dagger," which led the court to conclude that a city ordinance prohibiting the carrying of any pocketknife with a blade longer than a certain length was preempted by state law. Id.
In articulating the three ways that the legislature may "permit" conduct, the Jackson court emphasized that, if "the statute and its legislative history are silent or unclear as to whether a decision to 'permit' conduct has been made," the court should not assume that the legislature intended to "permit" it. Id . at 148-49, 850 P.2d 1093. The court expressly disavowed any such interpretation of Dollarhide , and it reiterated the importance of municipalities' rights to pass laws that regulate conduct within their jurisdictions. Id ."We cannot simply 'assume' that, by its silence, the legislature intended to permit conduct made punishable under an ordinance. The state constitutional rights granted to the citizens of a municipality are not so easily discarded." Id ."When a local criminal ordinance prohibits conduct, unless the legislature has permitted that same conduct, either expressly or under circumstances in which the legislative intent to permit that conduct is otherwise apparent , the ordinance is not in conflict with state criminal law and is valid under Article XI, section 2, of the Oregon Constitution." Id . (emphasis added).
The specific ordinance at issue in Jackson made it "unlawful for any person to expose his or her genitalia while in a public place or place visible from a public place, if the public place is open or available to persons of the opposite sex." Id . at 152, 850 P.2d 1093. A citizen challenged the ordinance as preempted by a state statute that made it a crime for a person to publicly expose one's genitals "with the intent of arousing the sexual desire of the person or another person." Id . The question before the court, therefore, was whether the statute reflected a legislative decision to "permit" the conduct that the ordinance proscribed, i.e. , "non-sexually motivated" public exposure of genitalia. Id . After examining the legislative history, the court concluded that the evidence of legislative intent was not strong enough to declare the ordinance unconstitutional. Id . at 154, 850 P.2d 1093. An older statute had *334 "[a]rguably" prohibited both sexually and nonsexually motivated public exposure of genitalia. Id . at 152, 850 P.2d 1093. That statute was repealed and replaced with the statute that prohibited only sexually motivated *914 exposure. Id . at 153, 850 P.2d 1093. Although the repeal of the earlier statute could "be evidence of a political decision to permit conduct that was previously forbidden," the court concluded that it was not, because the official commentary to the replacement statute did not indicate an affirmative intent to permit that conduct, even though it did expressly acknowledge that it would not violate the statute. Id . The commentary was "insufficient to demonstrate a legislative political decision to permit non-sexually motivated public nudity." Id . The court also declined to consider a comment on a "tentative draft" of the statute, regarding accidental or negligent exposure not violating it. Id. at 153-54, 850 P.2d 1093. Ultimately, the court upheld the ordinance, explaining, "In the absence of stronger evidence of legislative intent, we are unconvinced that the legislature intended to permit the conduct prohibited in the city ordinance." Id .
Jackson implicitly recognizes that not all legislative history is created equal. That point is made even more directly in Lodi :
"In theory, what the legislature 'permits' can range from express permissive terms to total inattention and indifference to a subject. The search is not for particular words but for a political decision , for what the state's lawmakers either did or considered and chose not to do. The search for a negative decision, in the context of preemption, can involve variations ranging from mere inaction on a bill or other proposal , which hardly represents a collective judgment, to rejection of a proposal by vote after debate (perhaps even after passage by one house) , which may be a collective decision although it also falls short of affirmative lawmaking."
Lodi , 308 Or. at 474, 782 P.2d 415 (emphasis added; footnote omitted).
Lodi foresees an important and challenging question that is inherent in the idea of implicit preemption and that remains unclear 25 years after Jackson : When does something that "falls short of affirmative lawmaking" nonetheless establish a "collective decision" of the legislature to "permit" particular conduct? We know that "silence" is *335 not enough. Jackson , 316 Or. at 149, 850 P.2d 1093. We also know that the legislative intent is supposed to be clear, not "unclear," and Jackson demonstrated that principle by rejecting a preemption challenge in the "absence of stronger evidence of legislative intent." Id . at 149, 154, 850 P.2d 1093. But what is enough? How much and what kind of "evidence" is necessary to establish that the legislature made a collective political decision about something, even if that decision is not reflected in affirmative lawmaking?
Part of the difficulty in answering that question lies in our historical ambivalence towards legislative history. To explain, a short detour into the land of statutory construction is necessary. In the past, for purposes of statutory construction, legislative history could be considered only if a statute was ambiguous on its face. State v. Gaines , 346 Or. 160, 164, 206 P.3d 1042 (2009). That changed in 2001, with the statutory amendment discussed in Gaines , and we may now consider legislative history at the first level of statutory construction. Id . at 171-72, 206 P.3d 1042. Even under the newer methodology, however, we are not required to seek out legislative history beyond that provided by the parties. Id . at 166, 206 P.3d 1042 ; ORS 174.020(3). Moreover, we have broad discretion in deciding how much weight to give to whatever legislative history we do consider. See ORS 174.020(3). "A court need only consider legislative history 'for what it's worth'-and what it is worth is for the court to determine." Gaines , 346 Or. at 171, 206 P.3d 1042.
For purposes of statutory construction, the Gaines court expressly repudiated the notion that legislative history should be given the same weight as text. It recognized that "[t]he formal requirements of lawmaking produce the best source from which to discern the legislature's intent, for it is not the intent of the individual legislators that governs, but the intent of the legislature as formally enacted into law." Id ."[T]here is no more persuasive evidence of the intent of the legislature than the words by which the legislature undertook to give expression to its wishes." Id . (internal quotation marks omitted). As explained in an 1868 treatise quoted by the Gaines court,
*915 "[N]ot only is it important that the will of the law-makers be expressed, but it is also essential that it be express in *336 due form of law ; since nothing is law simply and solely because the legislators will that it shall be, unless they have expressed their determination to that effect, in the mode pointed out by the instrument which invests them with the power, and under all the forms which that instrument has rendered essential ."
Gaines , 346 Or. at 171, 206 P.3d 1042 (quoting Thomas M. Cooley, A Treatise on the Constitutional Limitations 130 (1868) ) (emphasis added).
In other words, the legislature typically must take formal action before we will give the force of law to its intentions. Due to the critical distinction between formal legislative action and, frankly, everything else, "text and context remain primary" in statutory construction "and must be given primary weight in the analysis," whereas legislative history receives only "whatever weight [the court] deems appropriate." Id . at 166, 171, 206 P.3d 1042.
With that in mind, let us return to the law of preemption. There is inherent tension between our approach to legislative history when construing statutes and our approach to legislative history when analyzing preemption. In construing a criminal statute for purposes of convicting, fining, and jailing citizens, we are not required to search for any legislative history that the parties do not provide, we have broad discretion to disregard legislative history if we do not consider it useful, and we treat the words of the statute as far more compelling evidence of legislative intent than anything in the legislative history. In the preemption arena, however, we are required to pore over the legislative history and, at least in some circumstances, give it the same weight as affirmative lawmaking. And we are doing so for constitutional purposes.
This leads me to make two observations. First, we need better guidance from the Supreme Court as to the third means of establishing preemption under Jackson . Without it, there is too much risk of inconsistent decisions. Indeed, the "evidence" of legislative intent in Lodi , 308 Or. at 474-75, 782 P.2d 415 -the introduction of a bill with broad language about prohibited weapons, a house subcommittee's implicit decision not to outlaw the carrying of knives other than three *337 types, and the subsequent enactment of the amended bill-is not obviously that much "stronger" than the evidence that the court deemed "unpersuasive" in Jackson . The cases from our own court since Jackson also, in my view, do little to clarify the standard for implicit preemption and set a fairly low bar-lower than Jackson may have intended.
Second, we should be very cautious about finding collective "legislative intent" in legislative history. By definition, any analysis of implicit preemption involves a situation in which the legislature has not expressly occupied the field or expressly permitted the conduct at issue. As such, Jackson necessarily recognizes the possibility of establishing legislative intent by legislative history alone, and we are bound by Jackson . At the same time, we should not forget the cautions in Jackson , Lodi , and Gaines about different types of legislative history. We must ask ourselves whether a given piece of legislative history evidences the intent of the legislature , or whether it evidences only the intent of an individual legislator, the members of a particular committee or subcommittee, or perhaps even one legislative chamber.
We may also need to grapple with whether the reason that the legislature decides not to prohibit something is relevant. For example, if someone introduces legislation to regulate a broad class of weapons, and the legislature later decides to regulate a narrower class of weapons, does it matter why? Does it matter whether it was in response to citizen complaints about wanting to carry certain weapons, versus in response to a budget analysis of the cost to enforce a broader law? There are many reasons that the legislature may consider prohibiting, but then ultimately decide not to prohibit, particular conduct that do not necessarily reflect a collective decision that the conduct is desirable and affirmatively should be allowed to occur. Sometimes it is just not worth the effort and cost of regulating. Moreover, individual legislators may *916 have different reasons to support the bill that is actually up for vote, regardless of what the bill does not cover. The reason for a legislative decision not to prohibit certain conduct is yet another potential piece of the analysis. *338 As for the case before us today, the majority concludes that the legislature made a "deliberate choice" to require a knowing mental state under ORS 471.410(3). 293 Or. App. at 330-31. I cannot disagree with that conclusion. The original bill contained a "should have known" provision that would have applied to property owners who recklessly or negligently allowed minors to consume alcohol on their property. A legislative subcommittee decided that a "knowing" mens rea requirement was preferable, however, and the legislature ultimately enacted a statute with a "knowing" requirement. It appears that decision was made at least in part to avoid a political fight with property owners. Nonetheless, it was a "deliberate choice."
A "deliberate choice" by the legislature not to include certain conduct in a criminal statute, for any reason, appears to be all that we require under our current case law. In both City of Eugene v. Kruk , 128 Or. App. 415, 419-21, 875 P.2d 1190 (1994), and State v. Robison , 202 Or. App. 237, 243-44, 120 P.3d 1285 (2005), we struck down an ordinance as preempted by state law where there was legislative history indicating an affirmative decision in at least one chamber not to regulate passive conduct or impose strict liability because doing so could potentially infringe on citizens' First Amendment rights. In both of those cases, evidence of the legislature's "deliberate choice" to criminalize a more limited category of conduct was deemed enough, regardless of the reason for that choice.
Jackson suggests a higher standard. In my view, preemption should be limited to circumstances where there is clear evidence that the legislature made a collective decision that conduct should be affirmatively allowed in the State of Oregon. A choice not to prohibit certain conduct for political, budgetary, or like reasons should not be treated as preventing local governments from prohibiting that conduct in their own jurisdictions, nor should the views of only a subset of legislators lead us to declare a local ordinance unconstitutional. Here, the legislative history of ORS 471.410(3) does not persuade me that the legislature made a collective political decision that the citizens of our state should be allowed to recklessly, negligently, and unintentionally allow *339 teenagers to hold drinking parties on their property without any risk of criminal consequences. That said, under our existing case law, I concur.