WILLIAM J. BURSE *v.* AMERICAN INTERNATIONAL AIRWAYS, INC., ET AL.
(SC 16755)

Sullivan, C. J., and Borden, Katz, Palmer and Vertefeuille, Js.

---

Argued September 10—officially released November 12, 2002

*Michael J. Finn,* with whom was *Marie E. Gallo-Hall,* for the appellants (defendants).

*Bart A. Sayet,* for the appellee (plaintiff).

*Opinion*

KATZ, J. The defendants, American International Airways, Inc. (American), and its insurer, Legion Insurance Company (Legion), appeal[1] from the decisions of the workers' compensation review board (review board) affirming the decisions of the workers' compensation commissioner for the second district (commissioner)[2] awarding benefits to the plaintiff, William J. Burse. The dispositive issue in this appeal is whether the plaintiff, a Connecticut resident, is entitled to obtain Connecticut workers' compensation benefits, pursuant to General Statutes § 31-284 et seq., for an injury sustained out of state while working for American, a Michigan based employer. We conclude that the review board improperly affirmed the commissioner's determination that Connecticut was both the place of the employment relationship and the place of the employment contract. Accordingly, we reverse the review board's decision.

The record discloses the following undisputed facts and procedural history. In 1986, the plaintiff began his employment as a pilot for Connie Kalitta Services, Inc. (Kalitta), an airfreight transportation business headquartered in Ypsilanti, Michigan. In 1990, Kalitta changed its name to American International Airways, Inc.[3] American imposed no restrictions on where the plaintiff could live, other than that his residence had to be in one of the contiguous forty-eight states. Throughout his employment with Kalitta and American, the plaintiff resided in Connecticut.

On March 15, 1994, the plaintiff was assigned to fly cargo for the defendant from Atlanta, Georgia to Char-

---

[1] The defendants appealed from the workers' compensation review board's decisions to the Appellate Court, and we then transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

[2] The decisions appealed from were made by two different commissioners acting in their capacity for the second district. For purposes of simplicity, we refer herein to both as the commissioner.

[3] American's current headquarters are in Indiana.

lotte, North Carolina; from Charlotte to Ypsilanti, Michigan; and then from Ypsilanti back to Atlanta. While the plane was on the ground in Michigan, maintenance personnel repaired a burnt-out landing light. When the maintenance personnel left the plane, they failed to reseal the emergency exit door properly. After the plane had taken off and ascended to an altitude of 10,000 feet, the crew discovered that, as a result of the unsealed exit door, the plane could not be pressurized properly. The plaintiff, as the commanding pilot, ordered his crew to don oxygen masks,[4] while the plane continued to ascend. Somewhere between the altitude of 20,000 and 25,000 feet, the plaintiff began to feel the effects of decompression sickness.[5] At 30,000 feet, the plaintiff grabbed the throttle and reversed thrust on the engines, which caused the plane to descend rapidly. He then blacked out. The plane, piloted by the rest of the crew, made an emergency landing in Kentucky,[6] where the plaintiff was transported to and treated at a local hospital. He was transferred later to a Cincinnati hospital and then to Connecticut for the balance of his treatment.

As a result of oxygen deprivation during this incident, the plaintiff suffered and continues to suffer from numerous ailments including paralysis, myocardial infarction, cerebral hemorrhage, pulmonary edema, seizures, hypertension and septicemia. The plaintiff filed claims for workers' compensation benefits in both Michigan and Connecticut.[7]

---

[4] According to the plaintiff's testimony, a person who does not don a supplemental oxygen mask at heights above 10,000 feet runs the risk of decompression sickness.

[5] None of the parties was able to ascertain in exactly which state the plaintiff sustained his injury. All parties have stipulated, however, that the injury occurred over either Kentucky or Ohio.

[6] The other members of the crew were unaffected by the loss of pressurization.

[7] The plaintiff has received temporary benefits from Michigan, pursuant to Michigan law, but his case has yet to be accepted formally by the Michigan workers' compensation board.

The commissioner issued a decision on the issue of whether, although the plaintiff's injury had occurred out of state, Connecticut, nevertheless, had subject matter jurisdiction over the plaintiff's claim. After setting forth her findings of fact, the commissioner concluded that there was jurisdiction to entertain the claim because Connecticut was (1) the place of the employment contract, and (2) the place of the employment relationship. The defendants filed a motion to correct the commissioner's findings, which the commissioner denied. The defendants appealed from the commissioner's decision to the review board, claiming, inter alia, that the commissioner had applied an incorrect legal standard in rendering her decision and improperly had failed to include facts elicited at the hearing that demonstrated an absence of subject matter jurisdiction.

The review board affirmed the commissioner's decision, concluding that, in determining the issue of jurisdiction, the commissioner properly had applied the test that this court set forth in *Cleveland* v. *U.S. Printing Ink, Inc.*, 218 Conn. 181, 192–95, 588 A.2d 194 (1991), and that the commissioner's determinations that Connecticut was both the place of the employment relationship and the employment contract were reasonable. The review board noted that, although there were inconsistencies and contradictions within the plaintiff's testimony, there was a reasonable basis on which the commissioner could have inferred from the facts found that Connecticut law applied to the plaintiff's claim.

Thereafter, the commissioner issued a second decision, addressing the merits of the plaintiff's claim. The commissioner determined that the plaintiff was temporarily totally disabled, that he had suffered a compensable injury, and that he was entitled to receive workers' compensation benefits. On appeal of that decision, the

review board affirmed the commissioner's award.[8] This appeal followed. Additional facts will be set forth as necessary.

The defendants claim on appeal that benefits under Connecticut workers' compensation law are not available to the plaintiff.[9] Specifically, the defendants claim that the facts in the record demonstrate that the plaintiff failed to establish that Connecticut was the place of

---

[8] Following the review board's affirmance of the commissioner's award in this case, on March 28, 2002, Legion was placed in rehabilitation in accordance with Pennsylvania insurance law. During the pendency of this appeal, pursuant to a petition by the Pennsylvania insurance commissioner, appointed as a rehabilitator to take control of Legion's assets, a stay was imposed on June 29, 2002, to protect Legion from incurring future debt. At oral argument before this court, in addressing the issue of whether the stay rendered the appeal moot, counsel for Legion made the following undisputed representations: (1) the stay speaks to actions *against* Legion and its insureds; therefore, according to Legion, the stay is for its benefit and does not bar actions initiated by Legion to relieve it from the debt resulting from the review board's decisions in this case; (2) should Legion prevail on appeal, its obligation to pay the plaintiff benefits under Connecticut's workers' compensation scheme would be eliminated, and, therefore, our decision could afford meaningful relief; and (3) should this court affirm the review board's decisions, Legion interprets the stay as allowing it to continue to pay the plaintiff benefits, and that it intends to do so, as it has done all along. Because practical relief may be obtained by a favorable decision, we conclude that this appeal is not moot. *State* v. *McElveen*, 261 Conn. 198, 204, 802 A.2d 74 (2002).

[9] The defendants raise three other issues on appeal relating to the commissioner's second decision finding that the plaintiff was entitled to benefits. Specifically, they challenge the review board's decision affirming the commissioner's determination that the doctrines of collateral estoppel and res judicata did not bar the plaintiff's claim for benefits in Connecticut because, although the plaintiff was receiving workers' compensation benefits from Michigan, they were being provided on a without prejudice basis and, thus, the Michigan award did not constitute a final judgment or adjudication. Additionally, they claim that the review board improperly affirmed the commissioner's finding that the plaintiff's conduct on the date of the injury did not rise to the level of wilful and serious misconduct and the commissioner's denial of the motion to correct his findings of fact. Because our resolution of the issue arising from the commissioner's first decision relating to jurisdiction is dispositive, we do not reach these other claims.

either the employment contract or the employment relationship.

We first set forth our standard of review. It is well settled in workers' compensation appeals that "the court does not retry the facts. . . . It is the function of the commissioner to determine the credibility of witnesses and to find facts, and the finding will not be corrected unless it contains facts found without evidence or omits material facts that are admitted or undisputed." (Citation omitted.) *True* v. *Longchamps, Inc.*, 171 Conn. 476, 478, 370 A.2d 1018 (1976); accord *Six* v. *Thomas O'Connor & Co.*, 235 Conn. 790, 799, 669 A.2d 1214 (1996). "Although the court may not substitute its own conclusions for those of the administrative board, it retains the ultimate obligation to determine whether the administrative action was unreasonable, arbitrary, illegal or an abuse of discretion." *United Parcel Service, Inc.* v. *Administrator, Unemployment Compensation Act*, 209 Conn. 381, 385–86, 551 A.2d 724 (1988). When conclusions drawn by the commissioner result from "an incorrect application of the law to the subordinate facts or from an inference illegally or unreasonably drawn from them," the authority to reject such conclusions is well established. (Internal quotation marks omitted.) *Mazzone* v. *Connecticut Transit Co.*, 240 Conn. 788, 792, 694 A.2d 1230 (1997).

We begin our analysis by noting that this state has an "interest in compensating injured employees to the fullest extent possible . . . ." (Citation omitted.) *McGowan* v. *General Dynamics Corp.*, 15 Conn. App. 615, 622, 546 A.2d 893 (1988), aff'd, 210 Conn. 580, 556 A.2d 587 (1989). Problems arise, however, when employment is not necessarily fixed in Connecticut. The oftentimes transient nature of modern employment makes it difficult for states to determine which claims are compensable and which are not. Although the commissioner and the review board viewed this problem

as a question of jurisdiction, it properly is categorized as a question of conflict of laws. See *Thomas* v. *Washington Gas Light Co.*, 448 U.S. 261, 278–86, 100 S. Ct. 2647, 65 L. Ed. 2d 757 (1980); see also *Cleveland* v. *U.S. Printing Ink, Inc.*, supra, 218 Conn. 187 ("[A]lthough the two [questions] usually coincide, since normally the rights created by the [workers'] compensation act of one state cannot be enforced in another state . . . the question of jurisdiction ordinarily precedes the conflict of laws question, for only after the commissioner determines that he has authority to entertain the action does he proceed to the choice of whether to award benefits under [Connecticut's] Workers' Compensation Act or, rather, to defer to the earlier grant of benefits under the laws of another state. It is conflict of laws principles, therefore, that determine the merits of the [employers'] principal assertions." [Citation omitted; internal quotation marks omitted.]).

In *Cleveland* v. *U.S. Printing Ink, Inc.*, supra, 218 Conn. 195, this court set forth a three part test to determine when Connecticut workers' compensation law may be applied. Under the *Cleveland* test, the commissioner may apply Connecticut law if Connecticut is: (1) the place of the injury; (2) the place of the employment contract; or (3) the place of the employment relation. Id. The facts of that case did not require us to elaborate on what we meant by "the place of" in connection with the employment contract or employment relation,[10] and we subsequently have not revisited the choice of law issue in workers' compensation claims. After reviewing the sources on which we relied in *Cleveland*, we now clarify that this test requires, at a minimum, a showing of a *significant* relationship between Connecticut and either the employment contract or the employment rela-

---

[10] In *Cleveland*, the plaintiff, a New Jersey resident, was injured in Connecticut during the course of his employment. *Cleveland* v. *U.S. Printing Ink, Inc.*, supra, 218 Conn. 182.

tionship.[11] Applying this clarified test, we conclude that our workers' compensation law is not applicable because Connecticut did not have a significant relationship to the employment relationship or to the employment contract.[12]

The following additional facts are necessary to the resolution of this appeal. American, headquartered in Michigan at the time of the plaintiff's injury; see footnote 3 of this opinion; allowed its pilots to choose their primary airport or home base. At the time of the incident, the plaintiff, who resided in Connecticut, had chosen to be based out of Miami, Florida. It was American's practice to call the plaintiff wherever he was located to give him his flight assignment, which either commenced from the plaintiff's base in Miami or from some other airport. The plaintiff would then fly to his assignment at American's expense. While in transit to his assignment, the plaintiff received a per diem stipend of $1 per hour, up to a maximum of $24. The transit period commenced one hour prior to the plaintiff's departure from the local airport and concluded one-half hour after he returned to his home state. Although the plaintiff kept records of his travel expenses and flight patterns at his home in Connecticut, American did not require him to keep such records.

American did little business in Connecticut; less than 1 percent of its revenues were derived from Connecticut operations. While American occasionally flew into

---

[11] The sources on which this court relied in *Cleveland* do not treat this issue consistently; some require that the relationship be significant, while others require that the relationship be the *most* significant. See *Cleveland* v. *U.S. Printing Ink, Inc.*, supra, 218 Conn. 189–93. None of the parties in the present case has asked for further clarification of this issue. Moreover, the facts and circumstances of this case do not require that we decide which standard to apply, because the plaintiff has failed to satisfy either standard.

[12] We do not consider the first part of the *Cleveland* test, because it is undisputed that the injury to the plaintiff occurred somewhere over Kentucky or Ohio. See footnote 5 of this opinion.

Bradley International Airport in Windsor Locks, it had minimal personnel there, consisting of at least one mechanic. American did not maintain an office in Connecticut, and the plaintiff's paychecks were sent from Michigan. In the four years preceding his injury, the plaintiff flew into Bradley International Airport a total of twelve times.

We conclude that these facts do not reflect a *significant* relationship between Connecticut and the plaintiff's employment relationship. The plaintiff's only employment connections to Connecticut are: his residence as one of the departure points for his assignments; the location of his own records of business expenses; and the fact that the plaintiff occasionally flew in and out of Connecticut. The plaintiff's residence, from an employment standpoint, bears little weight in our determination, given that American did not require the plaintiff to live in Connecticut and that his employment did not necessitate such residency. Likewise, the fact that the plaintiff maintained business records in Connecticut does not indicate a significant relationship to his employment because American did not require the plaintiff to maintain such records. The only substantive employment contacts with Connecticut were the twelve flights that the plaintiff flew in and out of Bradley International Airport over the course of a four year period. When viewed in their totality, these contacts do not indicate that Connecticut had a significant relationship to the plaintiff's employment. Rather, these contacts indicate that Connecticut had, *at most,* a peripheral relationship to the employment between the plaintiff and American. Accordingly, we conclude that there was insufficient evidence in the record to support the commissioner's conclusion, which was affirmed by the review board, that Connecticut was the place of the plaintiff's employment relationship.

We now turn to the review board's determination that the commissioner's conclusion that Connecticut was the place of the plaintiff's employment contract satisfied the requirements of *Cleveland* v. *U.S. Printing Ink, Inc.*, supra, 218 Conn. 192. The commissioner's findings of fact indicate that the plaintiff was hired during the course of a telephone call he received at his home in Connecticut from Kalitta. In its review of the commissioner's decision, the review board rejected the defendants' contention that the employment contract had been formed during subsequent meetings in Michigan. The review board concluded that, although the plaintiff's testimony appeared contradictory, the inconsistencies could be explained by the fact that the plaintiff's testimony regarding the Michigan meetings referred to the *formalization* of the employment contract. We disagree.

The plaintiff's testimony reveals the following facts. The plaintiff received a telephone call at his home in Connecticut from Kalitta's chief pilot asking the plaintiff to fly out to Michigan to speak with people from Kalitta about a position with the company. Although he could not recall any specific details of the initial telephone conversation, the plaintiff testified that he believed that he had been offered employment during that conversation and that the initial meeting in Michigan merely was to confirm his credentials. The plaintiff then flew out to Michigan to meet with Kalitta's director of operations, at which time he discussed compensation and benefits and presented his pilot credentials. The plaintiff did not sign any employment papers prior to or after this initial meeting. The plaintiff further testified that after the meeting, the job offer was withdrawn because Kalitta expected that it would be losing the plane intended for the plaintiff.

Approximately one week later, Kalitta placed a second telephone call to the plaintiff in Connecticut. The

plaintiff's wife took the call, as the plaintiff was in Michigan training with another air cargo company. She telephoned the plaintiff in Michigan and told him, "Kalitta wants to see you." The plaintiff then had a second meeting with people from Kalitta, in Michigan, at which time, according to his testimony, he officially became a Kalitta employee.[13]

We are well aware that "[i]t properly belongs to the finder of fact to assess the credibility of witnesses." *SFP Tisca* v. *Robin Hill Farm, Inc.*, 244 Conn. 721, 731, 711 A.2d 1175 (1998). It is important to note that, in the present case, the plaintiff was the only person to testify as to the circumstances surrounding his employment contract.[14] Even if we were to assume that the plaintiff's testimony was fully credited by the commissioner, however, the facts as presented by the plaintiff undermine his own assertion that he became employed during the first telephone call he received in Connecticut from Kalitta. In fact, that testimony belies the commissioner's conclusion that he was hired in Connecticut.

There is no doubt that Kalitta, and thereafter American, employed the plaintiff, and that at some point an employment contract was formed between the parties. Our concern is with *when and where* the contract was formed. It is well settled that the existence of a contract is a question of fact. *Simmons* v. *Simmons*, 244 Conn. 158, 187, 708 A.2d 949 (1998). Although we generally defer to the commissioner on questions of fact, we do not do so if there is no reasonable basis for her decision.

---

[13] The plaintiff also testified that at this second meeting in Michigan he may have signed various forms including his health care insurance policy.

[14] American had one witness, David Ahles, who testified only as to the issue of American's policies regarding safety and hiring. He did not testify about the plaintiff's employment situation. American also submitted affidavits from the other members of the plaintiff's flight crew on the issue of the plaintiff's conduct on the day of the incident.

*Six* v. *Thomas O'Connor & Co.,* supra, 235 Conn. 798–99.

In the present case, we conclude that there is no reasonable basis for the commissioner's finding that Connecticut was the place of the plaintiff's employment contract. Although the plaintiff initially stated that he believed that the pertinent employment contract had been formed during that first telephone call, his later testimony acknowledging that this offer subsequently had been withdrawn expressly undermines that statement. Indeed, the plaintiff explicitly stated that he was employed by Kalitta, *not after the first telephone call,* but, rather, after his wife received a second call approximately one week later, while the plaintiff was in Michigan training with another airline.[15] The plaintiff's

[15] The plaintiff's testimony reveals the following pertinent facts related to his meetings with Kalitta in Michigan:

"[The Defendants' Attorney]: To the best of your knowledge, did you sign any papers prior to arriving in Michigan indicating that you were employed by this outfit?

"[The Plaintiff]: No, it was quite informal.

"Q. When you arrived in Michigan, did you sign anything to indicate that you were currently an employee of that outfit?

"A. No.

"Q. When you left Michigan after this [first] meeting, what was your understanding of what happened during that meeting?

"A. It was my understanding that . . . overnight . . . the job offer had temporarily been withdrawn because they thought they were going to lose the DC-9 completely, and they didn't have a spot for me right then.

"Q. Had you been offered employment?

"A. Yes.

"Q. Did they give you a starting date?

"A. No.

"Q. Was that offer of employment conditioned on your training as a pilot and your proof of physical capabilities?

"A. Restate the question, please?

"Q. Was the offer of employment conditioned on your proof of piloting capabilities and your physical well-being?

"A. For some reason I'm not understanding your question.

"Q. Did they say, 'Mr. Burse, we want to give you a plane, we want to hire you, show me your stuff that proves you're a pilot?'

"A. Yes, initially they did.

"Q. Okay. So you were actually employed by this outfit in Michigan?

testimony that his employment commenced *after* this second telephone call is further buttressed by the fact that he had to go back to Michigan a second time to meet with Kalitta personnel, at which point he received the job offer, which resulted in the employment contract in place at the time of the accident.

Although the review board concluded that the defendants, by highlighting the plaintiff's testimony about the events subsequent to the initial telephone call, were focusing unnecessarily on the *formalization* of the contract, we conclude that this testimony actually pertains to the *formation* of the contract. That the plaintiff was in Michigan training with another employer when he received the second telephone call undermines the commissioner's implicit finding that any contract with Kalitta resulting from the first telephone call was still in effect. More importantly, the withdrawal of the first offer by Kalitta prior to its second telephone call to the plaintiff further renders the commissioner's finding that an employment contract was formed in Connecticut unreasonable.

Because the pertinent employment contract was not formed during Kalitta's first telephone call to the plain-

---

"A. No, not at this time.
"Q. Were you employed after this time?
"A. Shortly thereafter.
"Q. And when did that occur?
"A. Roughly a week after—approximately a week after.
"Q. And where were you notified?
"A. I was notified by my wife while I was in ground school at another Ypsilanti-base[d] cargo company for DC-8's, that I had a call from Kalitta to get over [as soon as possible], and he offered me the job on the 727.
"Q. Was that information from your wife to you meaning, did your wife say, 'they offered you the job, get your rear end over there?'
"A. No, no. She said, 'Kalitta wants to see you.'
"Q. Okay. So, then, you met with the personnel at Kalitta again, correct?
"A. That's correct.
"Q. And that's when you got the job offer?
"A. That's correct."

tiff in Connecticut, we conclude that the review board improperly determined that the commissioner's conclusion that Connecticut was the place of the employment contract was supported by evidence in the record.[16] The relevant employment contract was not formed in Connecticut; therefore, Connecticut cannot have a significant relationship to that contract. Although we sympathize with the plaintiff's plight, the record simply does not support the conclusion that there is a significant relationship between Connecticut and the plaintiff's employment contract. The commissioner, therefore, improperly determined in its first decision that Connecticut law applies to the plaintiff's claim and, accordingly, lacked jurisdiction to award compensation benefits to the plaintiff in its second decision.

The decisions of the review board are reversed and the case is remanded to the review board with direction to reverse the commissioner's decisions.

In this opinion the other justices concurred.

---

[16] Even if we were to assume that the review board's characterization of what transpired following the first meeting as a "temporary suspension of the job offer" was accurate, we nevertheless conclude that there was insufficient evidence to support a conclusion that there was a substantial relationship between Connecticut and the contract.