# NATIONAL LOAN INVESTORS, L.P. *v.* WORLD PROPERTIES, LLC, ET AL.
## (AC 23322)
# NATIONAL LOAN INVESTORS, L.P. *v.* LAN ASSOCIATES XII, L.P., ET AL.
## (AC 23401)

Lavery, C. J., and Schaller and Peters, Js.

Argued May 5—officially released September 30, 2003

*Jeffrey D. Cedarfield*, for the appellants (defendants).

*Frederic S. Ury*, with whom, on the brief, was *Deborah M. Garskof*, for the appellee (plaintiff).

Opinion

SCHALLER, J. In these appeals from the judgments rendered against them in two actions brought by the plaintiff, National Loan Investors, L.P. (National), the defendants, World Properties, LLC (World Properties), World, LLC (World), LAN Associates XII, L.P. (LAN),

Antonio Reale and Nella Reale, challenge the trial court's voiding of several of their transfers of money and real property, and its ruling holding Antonio Reale in contempt and ordering him to pay damages to the plaintiff.[1] On appeal, the defendants claim that the court improperly (1) concluded that their real property in Enfield was an asset under the Uniform Fraudulent Transfer Act (UFTA), General Statutes § 52-552a et seq., (2) held that two counts of the plaintiff's complaint in the second action (AC 23401) were not barred by the statute of limitations and (3) imposed a civil contempt penalty on Antonio Reale. We reverse the trial court's order of contempt and affirm the judgments in all other respects.

The plaintiff brought its first action (AC 23322) against Antonio Reale, LAN and World Properties, alleging five counts of fraudulent transfer under the common law and the UFTA.[2] The plaintiff then brought the second action against Antonio Reale, his wife, Nella Reale, LAN and World. The complaint in the second action alleged nine counts of fraudulent transfer.[3]

The court found the following facts.[4] Antonio Reale was a successful contractor and land developer. He has been married to Nella Reale for more than thirty-five years. Nella Reale has never worked outside the home,

---

[1] The defendants in AC 23322 appeal only from the judgment that they fraudulently transferred property from LAN to World and fraudulently transferred funds from Antonio Reale to Nella Reale, and from the finding of civil contempt against Antonio Reale. Although only Antonio Reale was held in contempt, all of the defendants appeal from the judgment of contempt and the penalty imposed on Antonio Reale.

[2] The complaint in the first action primarily concerns the transfer of property in Enfield by LAN to World.

[3] The second count alleges various fraudulent transfers, but only counts six and seven, which concern Antonio Reale's transfer of mortgage proceeds to Nella Reale, are at issue here.

[4] Both appeals involve substantially the same individuals and share many common facts; thus, we set forth the facts for both appeals together.

nor has she had an independent source of income aside from the money given to her by her husband or from the companies her husband controls. Nella Reale does not, in any way, control any of the family finances. Despite that, all of the bank accounts associated with both Antonio Reale and Nella Reale are in Nella Reale's name. Antonio Reale himself selected the bank in which the accounts were opened, opened the accounts, is able to sign checks drawn on the accounts and controls the checking accounts.

To facilitate Antonio Reale's land developments, he "formed a number of companies, including corporations, general partnerships and limited liability companies to hold assets, operate business and funnel moneys." Three of those companies are the other three defendants: World Properties, World and LAN.

World "has no assets and does no business, but is used to funnel money between [Antonio] Reale's other entities and [Nella Reale]. [Nella Reale] allegedly makes loans to [World] despite having no income of her own." World is mostly owned by the Reale family, with Antonio Reale managing the company but owning only 1 percent, Nella Reale owning 51 percent, Joseph Reale, the Reales' son, owning 30 percent and Seraphina Capobianco, the Reales' daughter, owning 18 percent.

In contrast to the ownership of World, Antonio Reale owns 54 percent of LAN, Joseph Reale and Seraphina Capobianco own 18 percent each, and the remaining 10 percent is owned by a business partner. "All three companies . . . have the same employees, operate out of the same office space and have the same bookkeeper. The entities do not maintain separate payrolls." To protect themselves from creditors, all of the companies "transfer[ed] their income to Nella Reale, who had no creditors. Then, when any of the companies needed

funds, they would arrange to have funds transferred from Nella Reale's accounts back into the businesses."

LAN borrowed money from Chase Manhattan Bank (Chase) to purchase real property in Enfield and to construct a building on the property. Antonio Reale constructed a 113,000 square foot building and left vacant 135 acres. Chase later filed a foreclosure action against Antonio Reale and LAN for the Enfield property. Chase obtained a $17 million judgment in 1995.

Antonio Reale and LAN also owned property in New Jersey. Unfortunately for Antonio Reale, the "[Federal Deposit Insurance Corporation (FDIC)], as receiver for Central Bank, obtained a judgment of foreclosure against [Antonio] Reale and LAN on August 2, 1994, arising out of default of a mortgage on [the] property in New Jersey. The foreclosure did not satisfy the debt, and the FDIC obtained a revised final deficiency judgment" of approximately $7 million against LAN. The FDIC assigned the $7 million judgment against LAN to National. Thus, by 1995, Antonio Reale, with and through his various companies, owed Chase and National considerable sums of money.

In 1995, LAN managed to lease the previously vacant building on the Enfield property to First National Supermarkets.[5] With the lease, the Enfield Property was valued at $14.5 million. At the time of the lease, Antonio Reale "also reached a settlement with the successor in interest to Chase's judgment, WLL [Real Estate Limited Partnership (WLL)]." "WLL would compromise the $17

---

[5] The First National Supermarkets lease is considered to be very valuable because it is a triple net lease. "First National [Supermarkets] pays, in addition to rent, real estate taxes, maintenance and all other costs of the building's operation. Based on the fact that this is a triple net lease and was guaranteed by [Koninklijke Ahold N.B.], the lease . . . at its inception had a present value to the lessor estimated to be between $11,934,183 and $14,245,406."

million judgment and accept $5.2 million in full satisfaction of the debt."

To pay for the settlement, Antonio Reale and LAN obtained a mortgage loan from People's Bank. Antonio Reale and LAN did not receive the money from that loan directly, however, because Antonio Reale formed the company World Properties, which actually received the money from the People's Bank loan.[6] "People's Bank loaned World Properties . . . $4.9 million against the Enfield Property building and $750,000 against the vacant land."[7] World Properties then paid $5.2 million to WLL and, in return, received WLL's judgment against LAN and the Enfield property. World Properties foreclosed on both the Enfield property and the building, and LAN transferred title to the Enfield property to World Properties. LAN also assigned the First National Supermarkets lease to World Properties. "[N]o consideration for the assignment of lease was given to [LAN] from World Properties . . . ."

National, however, still held a $7 million judgment "at the time that the First National [Supermarkets] lease was executed and assigned, and the [previously] described foreclosure and financing transactions took place." As a result of the actions of Antonio Reale, LAN and World Properties, LAN had no assets to pay the National judgment, despite the fact that National had obtained its judgment one year before the People's Bank mortgage and transfers.

---

[6] The ownership of World Properties is similar to that of World; Nella Reale owns 63 percent, Seraphina Capobianco and Joseph Reale each own 18 percent, and Reale owns 1 percent. The court stated that "[a]lthough Nella Reale does not perform any work for this or any other company, she sometimes receives a monetary distribution, whether salary or draw, from [World Properties]. Neither Antonio Reale, Joseph Reale nor Seraphina Capobianco . . . receives any such distribution."

[7] World Properties also received money from two other mortgages. World Properties received a $1 million loan from First National Supermarkets in exchange for a second mortgage on the Enfield property and a $75,000 loan from WLL in exchange for a third mortgage on the Enfield property.

After a trial to the court, the court found, inter alia, that the Enfield property had been fraudulently transferred by LAN to World at the behest of Antonio Reale and ordered the Enfield property to be transferred back to LAN. Additional facts will be set forth as necessary.

I

The defendants' first claim is that the court improperly determined that the Enfield property was an asset capable of being fraudulently transferred as defined by the UFTA and the common law.[8] Specifically, the defendants' argue that the court improperly determined that the Enfield property's value exceeded the value of its valid liens and, therefore, was an asset. We are not persuaded.

"The question of whether a fraudulent conveyance took place is solely a question of fact to be determined by the trier. . . . We will not disturb the trial court's factual findings unless they are clearly erroneous and unsupported by the record. . . . Whether the plaintiff [is] entitled to set aside the conveyances, however, involves a mixed question of law and fact, and our review is plenary." (Citations omitted.) *Davenport* v. *Quinn*, 53 Conn. App. 282, 303, 730 A.2d 1184 (1999).

General Statutes § 52-552e (a) sets forth the test to determine whether a transfer is fraudulent: "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, if the creditor's claim arose before the transfer was made or the obligation was incurred and if the debtor made the transfer or incurred the obliga-

---

[8] Our analysis proceeds under the UFTA, but a common-law analysis would reach the same result. As our Supreme Court stated in *Molitor* v. *Molitor*, 184 Conn. 530, 535, 440 A.2d 215 (1981), the "similarities between [the uniform act] and our law are strong, since the uniform act . . . is largely an adoption and clarification of the standards of the common law." Further, neither party argues that the common law would produce a different result from the UFTA.

tion: (1) With actual intent to hinder, delay or defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due."

The term transfer is defined by General Statutes § 52-552b (12) to mean "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, or disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease and creation of a lien or other encumbrance." An asset is, among other things, "property of a debtor, but the term does not include . . . (A) Property to the extent it is encumbered by a valid lien . . . ." General Statutes § 52-552b (2). Property is "anything that may be the subject of ownership." General Statutes § 52-552b (10). A valid lien is "a lien that is effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings." General Statutes § 52-552b (13). Thus, a transfer cannot be considered fraudulent if, at the time of the transfer, the transferred property is encumbered by valid liens exceeding the property's value because the property would no longer be considered an asset under § 52-552 (b) (2), and only assets may be transferred fraudulently. See generally *Dietter* v. *Dietter*, 54 Conn. App. 481, 494, 737 A.2d 926, cert. denied, 252 Conn. 906, 743 A.2d 617 (1999).

The defendants argue that the court should have considered the Enfield property to be encumbered by the $17 million lien, which would have exceeded the $14.5 million value the court assigned to the Enfield property. Under the defendants' argument, the transfer of the

Enfield property could not be fraudulent because it was not an asset. That argument fails, however, because the defendants, in reaching their settlement with WLL, fully discharged the $17 million lien and substituted the $5.2 million lien in its stead. That settlement occurred prior to the transfer between LAN and World. Therefore, when LAN transferred the Enfield property to World, the Enfield property was an asset under § 52-552b (2) because its value, $14.5 million, exceeded the valid lien of $5.2 million. Cf. *Kellstrom Bros. Painting* v. *Carriage Works, Inc.*, 117 Or. App. 276, 844 P.2d 221 (1992) (under UFTA, when value of liens against property exceeds property's value, property not an asset because it has no equity), cert. denied, 316 Or. 162, 856 P.2d 317 (1993).

The court's factual determination that the Enfield property was an asset was not clearly erroneous. The court's legal conclusion that the transfer should be set aside was not improper.

## II

The defendants' second claim is that the court improperly determined that two counts of the plaintiff's complaint in the second action were not barred by the statute of limitations. We are not persuaded.

The following additional facts, found by the court, are necessary for the resolution of the defendants' claim. Antonio Reale, through one of his companies, owned a building in Vernon that housed a Howard Johnson's motel. In 1988, Antonio Reale sold the building to the tenant, Shri Nathji Associates (Shri Nathji), and received a $250,000 mortgage. Antonio Reale received payment on the mortgage from 1988 to 1995, when he then sent Shri Nathji a letter instructing Shri Nathji to make future payments to Nella Reale.[9] Notably, the

---

[9] The letter from Antonio Reale stated in relevant part: "This letter is your notice that the Mortgage Note on the [Howard Johnson property] has been assigned to my wife, Nella Reale. Commencing with the March payment, please make the check payable to Nella Reale. The check should continue to come to this office."

payments were still to be sent to Antonio Reale, who would then give the payments to Nella Reale. Despite the letter, the court found that "the mortgage was never assigned to Nella Reale and, therefore, there was nothing on the land records reflecting such an assignment." Nella Reale did not handle the banking and did not personally handle any of the money from the Shri Nathji mortgage.

In 1998, Shri Nathji inquired of Antonio Reale about the possibility of a payoff of the mortgage. Shri Nathji did not speak with Nella Reale about the potential payoff. Antonio Reale agreed to a payoff, and Shri Nathji gave Antonio Reale a $156,845.29 check; Antonio Reale received the check and transferred it to Nella Reale by depositing it into her account.[10]

The plaintiff filed an amended complaint on December 9, 1999. Counts eight and nine of the complaint alleged that Antonio Reale's transfer of $156,845.29 into Nella Reale's account was fraudulent, and the plaintiff sought to set aside the transfer. The defendants asserted a statute of limitations defense. The court rejected the defendants' statute of limitations defense, held that Antonio Reale fraudulently transferred the $156,845.29 and voided the transfer.

"As an initial matter, we set forth the applicable standard of review. The question of whether a party's claim is barred by the statute of limitations is a question of law, which this court reviews de novo." (Internal quotation marks omitted.) *John H. Kolb & Sons, Inc.* v. *G & L Excavating, Inc.,* 76 Conn. App. 599, 609, 821 A.2d 774, cert. denied, 264 Conn. 919, 828 A.2d 617 (2003). The court's determination of the facts, however, will not be disturbed unless it is clearly erroneous. See

---

[10] Nella Reale's account was, presumably, the only personal account in which the money could be placed because Antonio Reale did not maintain any personal accounts.

*Giulietti* v. *Giulietti*, 65 Conn. App. 813, 833, 784 A.2d 905, cert. denied, 258 Conn. 946, 947, 788 A.2d 95, 96, 97 (2001).

"The UFTA sets forth three limitation periods in [General Statutes] § 52-552j. The first limitation of action of four years applies to transfers made with actual intent under § 52-552e (a) (1). The second statute of limitations of four years contained in § 52-552j (2) applies to transfers made with constructive fraudulent intent under § 52-552e (a) (2). Section 52-552j (3) contains the third and final limitation and provides for a one year statute of limitations for constructive fraudulent conveyances to an insider for an antecedent debt." *Connecticut National Bank* v. *D'Onofrio*, 46 Conn. App. 199, 209, 699 A.2d 237, cert. denied, 243 Conn. 926, 701 A.2d 657 (1997). Because the court found that the defendants had actual intent to defraud, the relevant statute of limitations is four years.

The defendants argue that Antonio Reale's letter to Shri Nathji instructing future payments to be made to Nella Reale, which was sent four years and ten months prior to the plaintiff's amended complaint, constituted the transfer and that the plaintiff's claims were barred by the statute of limitations. The defendants reason that Antonio Reale had no legal right to the money after the letter and that he could not have possibly committed fraud in subsequently giving the money to Nella Reale.

"Courts have demonstrated a ready willingness to look beyond the form of a transaction to its substance. . . . It is the effect of the transaction which courts scrutinize. A 'conveyance' is likely to be found whenever the effect of a given action is to place a debtor's property beyond the reach of creditors." 5 Debtor-Creditor Law (T. Eisenberg ed., 2002) § 22.04 (A) (2) (h). "Because we refrain from exalting form over substance, we look to the essence of the transaction." *Starr* v.

*Commissioner of Environmental Protection,* 236 Conn. 722, 742–43, 675 A.2d 430 (1996); see also *In re Haley B.,* 262 Conn. 406, 415, 815 A.2d 113 (2002); *Stepney Pond Estates, Ltd.* v. *Monroe,* 260 Conn. 406, 422, 797 A.2d 494 (2002).

The court was not required to accept the defendants' argument that the letter was the relevant and dispositive transfer. Further, the court was not required to credit the defendants' testimony that the letter was not a sham. See *Burse* v. *American International Airways, Inc.,* 262 Conn. 31, 42, 808 A.2d 672 (2002) (determination of credibility is province of trier of fact). In the letter, Antonio Reale specifically instructed Shri Nathji to continue to send the payment checks to Antonio Reale's business office. In addition, Antonio Reale and his companies continued to receive the proceeds of the mortgage after they were funneled into his wife's account, through World, and then back to the other companies. Further, even though the checks were made payable to Nella Reale, Antonio Reale continued to be in charge of all of Nella Reale's finances. Moreover, Antonio Reale personally received the $156,845.29 payoff for the mortgage in 1998, only one year before the plaintiff's amended complaint was filed. The court, examining the substance of the transaction, reasonably could have found that the letter to Shri Nathji was a failed attempt at sham formality.

Those facts indicate that when Antonio Reale took the mortgage payoff money and placed it into his wife's account, he transferred the money. The court's finding that the transfer took place in 1998 was not clearly erroneous. We agree, therefore, with the court's legal conclusion that the plaintiff's claims were not barred by the statute of limitations.

III

The defendants' final claim is that the court improperly imposed a civil contempt penalty on Antonio Reale.

The defendants specifically argue that the civil contempt penalty was improper because the amount of the penalty was incorrect, and the court did not make a determination of whether Antonio Reale had the ability to purge himself of the contempt.[11] We agree.

The following additional facts are necessary for the resolution of the defendants' claim. On January 24, 2000, the court granted a preliminary injunction against Antonio Reale, his companies and his agents. The court stated that Antonio "Reale was barred from transferring any assets personally or in his capacity as an officer of any entity except in the ordinary course of business." Nevertheless, he "transferred his entire ownership interest in the company T.M.A. (Techologia Medica Avanzata DRL) to his daughter, Seraphina Reale Capobianco, on July 11, 2000 . . . [when] he was aware that he was under court order to refrain from doing so." Antonio Reale attempted to explain away the transfer, but the court found his explanation for the transfer to be "incredible to the point of perjury."[12]

The court imposed "a fine . . . in the amount of $440,000 payable to the plaintiff to compensate the plaintiff for the loss of assets which would have been otherwise available to satisfy the plaintiff's judgment . . . ." The court based its $440,000 figure on Antonio Reale's testimony; he had previously testified that in 1996, the shares of stock were worth $440,000. Further,

[11] It is important to note what the defendants do not claim. The defendants do not claim that the contempt order itself is invalid; rather, the defendants request only that this court review the amount of the fine and remand the case to the trial court for a determination of whether Antonio Reale has the ability to pay the fine and to satisfy the contempt order.

[12] Antonio Reale explained that if he failed to transfer the shares to his daughter, another member of the company would have transferred the shares to her. Antonio Reale also explained that the shares were transferred to Seraphina Capobianco to repay her for a $100,000 loan she made to one of his companies, although he was unable to identify the company to which she had made the loan.

the court ordered that if Antonio Reale failed to pay the $440,000, he would be taken into custody until the amount was paid. After the judgment of contempt, the defendants filed a motion for reconsideration and specifically requested that the $440,000 sum be reduced to $100,000. The court denied the defendants' motion for reconsideration.

"A contempt adjudication may be reviewed to determine . . . whether the punishment inflicted was authorized." *Mays* v. *Mays*, 193 Conn. 261, 265, 476 A.2d 562 (1984). We review the trial court's order of contempt and penalty imposed on an abuse of discretion basis. *In re Brianna B.*, 66 Conn. App. 695, 706, 785 A.2d 1189 (2001); *Lord* v. *Mansfield*, 50 Conn. App. 21, 34, 717 A.2d 267, cert. denied, 247 Conn. 943, 723 A.2d 321 (1998).

"In Connecticut, the court has the authority in civil contempt to impose on the contemnor either incarceration or a fine or both." *Papa* v. *New Haven Federation of Teachers*, 186 Conn. 725, 737–38, 444 A.2d 196 (1982). "[A] fine may be remedial or it may be the means of coercing compliance with the court's order and compensating the complainant for losses sustained. . . . The fine imposed for a civil contempt may be payable to the complainant as compensation for his loss." (Internal quotation marks omitted.) *Lord* v. *Mansfield*, supra, 50 Conn. App. 34. "[I]n civil contempt proceedings, the contemnor must be in a position to purge himself. . . . Otherwise the sanction imposed would cease to be remedial and coercive but would become wholly punitive in actual operation."[13] (Citation omitted; internal

---

[13] Both the plaintiff and the defendants cite the proposition that "[t]he inability of the defendant to obey an order of the court, without fault on his part, is a good defense to a charge of contempt." (Internal quotation marks omitted.) *Mays* v. *Mays*, supra, 193 Conn. 264. That proposition, however, is inapplicable. Antonio Reale had the ability to obey the order of contempt; he did not need to transfer the Techologia Medica Avanzata DRL stock to Seraphina Capobianco. He could have avoided the civil contempt but chose not to do so.

quotation marks omitted.) *Mays* v. *Mays*, supra, 193 Conn. 266.

The court exceeded its discretion in imposing the $440,000 fine without determining whether Antonio Reale actually possessed the assets to purge himself of the contempt by paying the fine. The plaintiff argues that the court's lack of inquiry into Antonio Reale's ability to pay the fine was mitigated by the fact that the court heard Antonio Reale's testimony, which, according to the plaintiff, enabled the court to determine that he could pay $440,000.[14] Although the court had heard testimony regarding Antonio Reale's assets, the testimony primarily focused on the transfer of assets and their value at the time of transfer. The testimony did not focus on what assets Antonio Reale currently held or the current value of his assets. Given those circumstances, the court exceeded its discretion in relying on the trial testimony and not making a separate inquiry into Antonio Reale's ability to pay the fine because the trial testimony did not address Antonio Reale's current assets.

The court also exceeded its discretion when it used Antonio Reale's statement that the Techologia Medica Avanzata DRL stock was worth $440,000 to determine the value of the stock and, thus, the civil contempt fine. Antonio Reale's statement that the stock was worth $440,000 was made in 1996, six years prior to the court's civil contempt judgment. It is common knowledge that stock prices tend to fluctuate, especially in our present global economy. Thus, the present value of any stock may have been quite different six years prior to the civil contempt judgment. The court, therefore, exceeded its discretion because in using the value from six years

---

[14] The plaintiff's counsel conceded at oral argument that the trial court should have made an inquiry, but argued that the court's opportunity to listen to the testimony obviated the need for the inquiry.

ago, it based the amount of the fine on irrelevant information.

We conclude that the court exceeded its discretion in its determination of the value of the stock on which it based its fine, and in its failure to determine whether Antonio Reale was capable of paying the fine and, therefore, purging himself of the contempt.

The judgment in the first case is reversed only as to the finding of contempt as against Antonio Reale and the case is remanded for further proceedings to determine the value of the Techologia Medica Avanzata DRL stock when it was transferred and whether Antonio Reale has the ability to pay any fine that the trial court may impose. The judgments are affirmed in all other respects.

In this opinion the other judges concurred.